SEYMOUR RUFF & SONS, INC., *v.* BRICKLAYERS',
MASONS' & PLASTERERS' INTERNATIONAL
UNION.

[No. 41, October Term, 1932.]

*Decided February 17th, 1933.*

The cause was argued before BOND, C. J., PATTISON,
URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Henry Duffy* and *Myer Rosenbush,* with whom were *Rosenbush & Bernslein* on the brief, for the appellant.

*William L. Marbury* and *William L. Marbury, Jr.,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court No. 2 of Baltimore City, dismissing a bill in equity, and dissolving a temporary injunction issued on the *ex parte* application of the plaintiff, the appellant in this court.

The bill alleged that the plaintiff, Seymour Ruff & Sons, Inc., had been engaged in the business of stone mason contractors in Baltimore City for many years, first as a partnership and since 1928 as a corporation, and that during the entire time in which it had been so engaged it had conducted what is known as a "union shop," employing only union men affiliated with the defendant, the Bricklayers', Masons' & Plasterers' International Union of America, and its subordinate unions, and with these men had done work in various cities and states of the United States, and while so engaged there was no grievance, trouble, or controversy of any kind between it and its employees. That the defendant is a voluntary unincorporated association with its principal office in Washington, D. C., and subordinate lodges, called "unions" or "locals," in cities of the United States and Canada. That for some reason unknown to the appellant the appellee for some years past, through its officers, agents, and servants, has been "harassing, annoying and interfering with" the plaintiff "in the conduct of its business and in the performance of its contracts with those with whom" it "has been doing business, and these unlawful, illegal and unwarranted acts of said defendant have caused losses to the plaintiff aggregating many thousands of dollars," and that none of these acts was warranted by the constitution and by-laws of said defendant or by anything done by the plaintiff.

The bill alleged specifically some of the illegal and unwarranted acts of the defendant, of which the plaintiff complained, among them being those in connection with the building of a church in Frederick, Md., in January, 1929, as a result of which an action was brought and a judgment recovered by the plaintiff against the defendant for the sum of $17,310.24, which, upon appeal to this court, was affirmed. *Bricklayers', Masons' & Plasterers' International Union of*

*America v. Seymour Ruff & Son, Inc.,* 160 Md. 483, 154 A. 52, 53.

In addition thereto, the bill charged the defendant with certain illegal and unwarranted acts in connection with the masonry work on a school building in Danville, Pa., done by the plaintiff in the fall of 1929 under a contract made by it with the general contractor. As alleged, some of the union men employed on the job proved incompetent; others indicated an unwillingness to perform a fair day's work. These men were discharged. As a result of that, a strike was ordered which lasted for several weeks before it was called off, and in consequence of the strike the plaintiff suffered great loss and damage.

The bill also alleged: That the defendant wrongfully and illegally interfered with the plaintiff to its great loss and damage in obtaining contracts, and in carrying them out when made, among which were the contracts for work on the Baker residence, Washington, D. C., the Home for Needy Confederate Women at Richmond, Va., and the Connecticut Avenue Bridge in Washington, D. C. That, pursuant to its purpose "to seriously injure and damage" the plaintiff, manifested in various ways, and "with the ultimate view of compelling" it to go out of business, as it could not possibly continue in business as it had for many years past, unless it could employ union labor, the defendant wrote the plaintiff the following letter:

"Washington, D. C., June 18, 1931.
"Registered Mail. Return Receipt
Requested.

"Seymour Ruff & Sons, Inc., 2133 Maryland Avenue, Baltimore, Maryland.

"Gentlemen: We call your attention to section 16, subsection 2 of article 18 of the constitution of the Bricklayers', Masons' & Plasterers' International Union of America, which provides as follows:

"2. No member of this International Union shall work for any person, firm or corporation which employs non-union employees in any branch of the trades within the jurisdiction of this International Union, or

work for any sub-contractor who takes a contract from any person or firm which employs any non-union employee in any branch of the trade composing this International Union, or work for any firm or person, either directly or indirectly, which has been placed on the unfair list by the International Union."

"We are advised by counsel that the enforcement of this provision against companies entering into contracts with general contractors employing non-union labor in direct competition with members of our union, is legally permissible. In view of the fact that your company persists in accepting sub-contracts from general contractors known by your company to employ non-union labor in direct competition with members of our union, we are writing to advise you that the members of this union will decline to accept employment from you on jobs begun on and after the 15th day of July, 1931.

"We are writing you this letter at this time in order that you may be given full opportunity to make such other arrangements as the necessities of your business may require. We desire to advise you further, however, that any contracts on which members of this union have begun work or have accepted employment prior to the aforementioned date, will be fulfilled to the letter as far as the members of this union are concerned.

"We do not believe you can reasonably expect the members of this union to work on a job under a general contractor who is opposed to union principles and who brings union and non-union men into direct competition.

"Very truly yours,
"[Signed]    John J. Gleeson, Secretary."

The bill then alleged: It was evident from the language of this letter that the defendant and all connected with it intended to do everything in their power not only to prevent the plaintiff from continuing on with the work it had already contracted to do, but also to prevent it from securing contracts in the future. That subsection 2 of section 16 of article 18 of the constitution and by-laws of the defendant was

adopted at its annual convention in September, 1930. Prior to that time the constitution and by-laws of the defendant contained no such provision, and the plaintiff is "convinced and therefore avers that said section was adopted for the sole purpose of placing said defendant in the position of doing precisely what it has done * * * to wit, to compel" the plaintiff "to discontinue business." That the charge contained in the letter that the plaintiff persists in accepting subcontracts from general contractors known by it to employ non-union labor is "absolutely false and untrue in every particular and the falsity thereof was known to said defendant and its officers" at the time the letter was written.

The bill also alleged: That the members of the defendant's association are now employed by subcontractors on a number of jobs in Baltimore City where the general contractors for such work are known and recognized as "open shop" contractors, who employ men whom they deem competent to do their work "irrespective of whether they are union or non-union, and no effort has been made by said defendant, its officers, agents and servants to in any manner interfere with any of said jobs or to prevent its members from working with, for and under such open shop contractors, but on the contrary, said jobs are progressing without interference or interruption, and members of said defendant are working on said jobs daily with non-union mechanics." That the sole and absolute power "to declare strikes of members of said defendant, is vested in said defendant, and if said defendant declares a strike or orders its members to discontinue their employment * * * said employees are bound so to do, otherwise they will be subject to severe fines, penalties and expulsion from their union," and, should they order the plaintiff's employees to discontinue working for it, "as they have expressed their determination to do" in the letter of June 18th, "said employees will quit work and discontinue their employment" with the plaintiff, and that, if "said defendant is permitted to carry out the threat contained in the letter * * * and order the mechanics employed" by it "to refuse to work for" the plaintiff, "it will compel" it "to go out of business." "That

no damages will compensate for the loss of a business and business reputation built up over a period of more than thirty years by hard work and earnest effort; that these constitute assets which money cannot buy or favor procure, and these invaluable assets will be utterly destroyed if said defendant is permitted to carry out its malicious, wanton, unlawful and illegal acts as manifested in said letter." That the plaintiff's relations with its own employees "are and have always been satisfactory and of a friendly nature and that no controversy of any kind exists between" it and any of its employees, "nor is there any controversy of any kind between it and those with whom it has contracted, and any interference by the defendant, its officers, agents and servants with any of said jobs by the calling of a strike or ordering the men employed" by the plaintiff "to discontinue work will work great and irreparable injury and damage" to the plaintiff, and, as above stated, compel it to discontinue business and subject it to suits for damages by those with whom it has contracted, by reason of its inability to complete the various jobs, which it has undertaken by contract with various parties.

Upon the allegations of the bill, a preliminary injunction was granted, which in effect restrained the defendant from interfering in any manner with the plaintiff in the performance of its contracts, and from carrying out its determination not to allow its members to accept employment from the plaintiff, as expressed in the letter of June 18th, 1931.

The defendant in its answer to the bill admitted the calling of the strike by the defendant at Frederick, which resulted in the suit and recovery by the plaintiff of the judgment against the defendant. It also admitted the strike at Danville, but asserted that the reasons for calling the strike were adequate and amply sufficient in law. The answer contained a general denial of the charge of conspiracy, and specific denials of the charges of interfering with the plaintiff in obtaining or carrying out its contracts. It further denied the charge that section 16, subsection 2, of article 18 of the Constitution of the International Union, was adopted for the purpose of empowering the defendant to injure the plaintiff, and alleged

that such constitutional provision was only an expression in clear language of a policy of the defendant which had been in force for many years prior to the date of its adoption. The defendant admitted by its answer that it sent to the plaintiff the letter of June 18th, 1931, though it denied that it was sent "with any purpose to injure or damage the plaintiff, but for the express purpose of giving the plaintiff an opportunity to avoid any damage or injury which might incidentally result from an unannounced enforcement by the defendant of the agreement between its members embodied in its constitution." It also denied "that its object in addressing said letter to the plaintiff was to compel the plaintiff to discontinue its business or to injure or hamper the plaintiff in any way, but on the contrary avers that the sole motive which induced it to address said letter to the plaintiff was the necessity for the enforcement of its own constitution which embodies the agreement entered into voluntarily by every member of the defendant union, not to accept employment under conditions destructive of the right to collective bargaining, and the defendant avers that the provisions of said constitution are reasonable and proper provisions, the due observance of which is vitally necessary to the maintenance of the principle of collective bargaining, and indeed to the very preservation and continued existence of the defendant as an agency for ameliorating labor and trade conditions, and that if said constitution is not enforced in a case so flagrant as the present one the result would be so to cripple and hamper the defendant as to most seriously impair its usefulness."

A great volume of testimony was heard in the case. Much of it was immaterial and irrelevant, and a great part of it trifling in its character. It is shown, however, from the record, that the plaintiff has for a number of years employed only members of the defendant association, with which it had always maintained friendly relations. Not until the controversy occurred over the building of the church at Frederick were these friendly relations disturbed.

The trouble between the parties at Frederick arose from the fact that the plaintiff contracted with one Culler, a gen-

eral contractor, to do the brick and masonry work on the church. Culler, it seems, did not wholly confine himself to the employment of union men of the defendant's craft. While the church at Frederick was in the course of construction, Culler had in his employ non-union bricklayers and masons working on a school building under construction at Frederick. The defendant, on learning of this fact, demanded that the plaintiff have Culler employ only union men on the school building, and the plaintiff was told by the defendant that, if it failed to bring about that result, the defendant would call a strike on the work being done by the plaintiff on the church. Culler continued to employ non-union men on the school building, and in consequence thereof the strike was called, and the plaintiff's work stopped on the church. As a result of the strike, the plaintiff was unable to continue and complete the work under its contract with Culler, and the work was then completed by some one else. The plaintiff then sued and recovered judgment for damages suffered by him because of its failure or inability to complete its contract.

The question in that case (*Bricklayers', Masons' & Plasterers' International Union of America v. Saymour Ruff & Sons, Inc., supra*) was "whether an employer who has entered into a subcontract to perform work on a certain building may recover damages against the labor unions of which, with his knowledge, his employees are members, because those unions have ordered them to quit work on the building in question for the reason that the general contractor has refused to employ union labor on other jobs in the same locality; there being no contract of employment between the subcontractor and his employees."

In deciding the question there presented, this court, speaking through Judge Digges, said: "Workmen have the undoubted right to organize for the purpose of securing lucrative employment under proper conditions as to working hours and wages; that, in order to enforce such right, they may peaceably strike or quit work, without liability, in cases where there is no contract of employment to the contrary; that what is a legal right of an individual does not become illegal sim-

ply because done in combination with others by concerted action. There would seem to be no doubt that laborers working for an employer against whom they had a just or fancied grievance as to hours of work, wages, and the like, about which there was dispute with the employer, and with whom they have no contract as to the term of their employment, are entitled to withdraw, either singly or in combination, for the purpose of coercing their employer into complying with their demands; and, even though such quitting results in loss and damage to the employer, it is not an actionable wrong. This must be true, because, when not bound by contract, every free man has a natural right to work for whom he pleases, and to cease to work when he chooses, without liability on his part to the employer. To enforce the opposite view would lead to the establishment of involuntary servitude. Every employer must recognize this right on the part of the employees, and, if by such action loss results, it is *damnum absque injuria*. The employer has the same undoubted right, when not prevented by contract, to discharge the employees, which may, and in many cases does, result in loss and injury to the employee and those dependent upon him; yet this loss and injury, too, must be suffered by the employee without being able to maintain an action therefor against the employer."

But we further said in that case: "The plaintiff may have been in entire sympathy with union labor, and the allegations of the bill indicate that it was; yet it had no power to coerce its general contractor into employing only union men. The real grievance of the union was not with the plaintiff, but with Culler for his not unionizing his work; and the plaintiff is the innocent victim of such action on the part of the defendants. * * * The defendants owed to the plaintiff the duty of noninterference with the conduct of its work or employees, so long as there was no contention or dispute with it. It is an effort by the defendants to obtain a decision in their favor as against Culler, by forcing an innocent third party, the plaintiff, which has no interest in the dispute, to coerce Culler to accede to the defendants' demands. Such a strike is not a

justifiable interference with the right of the plaintiff. to pursue its calling without entanglement, by reason of the fact that Culler does not employ exclusively union labor. In our opinion, organized labor's right of coercion and compulsion is limited to strikes on persons with whom the organization has a trade dispute."

After the troubles between the parties at Frederick, their next controversy, at Danville, Pa., originated with the local union, because, as we have said, of the discharge of some men whom the plaintiff thought were either incompetent or not disposed to do the amount of work reasonably expected of them. There were also charges of unfit working conditions, and of insufficient wages paid to some of the workmen. As a result of these charges, a strike was called, and, after negotiations on the part of the plaintiff with the representatives of the defendant at Washington, the strike was called off. But this was not done until the plaintiff had complied with the demands of the defendant. The plaintiff in all cases paid as much as the union wage scale and in many cases even more; and there was nothing to indicate that the plaintiff was not in every way attempting to conform to the rules of the union. The complaints of the union and its subordinates were often trifling, and there was no charge, so far as the record discloses, that upon the Danville job the plaintiff was acting in violation of the rule of the union prohibiting a subcontractor from contracting with a general contractor who employed non-union bricklayers and masons in other work done by him. However, it was shown from the evidence that on the Richmond job, which was after the building of the church at Frederick, the general contractor with whom the plaintiff had contracted to do the masonry work was at that time employing non-union bricklayers and masons on a building at Humphrey, Va., though it was not shown that the plaintiff had knowledge of that fact. The record also discloses that, while an attempt had been and is still being made to enforce the rule against the plaintiff, others have been and are still violating the rule, without any attempt on the part of the union to enforce it against them, although it is asserted

by the representatives of the union that they had no knowledge of any such violations.

There was little evidence in addition to that already mentioned to support the general charge of the defendant's interference with the plaintiff in the obtention or in the carrying out of contracts.

It is contended by the plaintiff that the acts of the defendant, which occurred after the troubles at Frederick, including the passing of the rule, and the sending of the letter to the plaintiff by the defendant in consequence of the passage of that rule, in which letter the plaintiff was told that the members of the union would decline to accept employment from it, were unlawful, wantonly, and maliciously done to injure, damage, and destroy the plaintiff's business. While it is the contention of the defendant that the acts complained of were lawful, and not done with the view of injuring or destroying the plaintiff's business, but to advance the welfare of the members of the union and to strengthen the union itself.

It is disclosed by the record that it had for many years been the policy of the union to prohibit its members from accepting employment from subcontractors who contracted with general contractors employing non-union men of its craft on other jobs, and the rule passed in September, 1930, was only declaratory of that policy. It is asserted by the representatives of the defendant union that this policy and the rule passed in consequence of it was essential to the proper advancement and protection of the interests of the union. In the brief of the appellee, it is said: "The decision of this court in *Bricklayers', etc. Union v. Ruff*, 160 Md. 483, 154 A. 52, naturally raised difficulties as to the means whereby the appellee union could pursue this policy so essential to its existence," and that it "was convinced that the continued pursuit of this more than fifty-year-old policy was essential to the maintenance of its bargaining power and its ability to secure fair wages and employment for its members."

It was conceded by the representatives of the union that the promulgation of the rule and the sending of the letter

complained of was in consequence of the court's statement of the law applicable to the Frederick situation, and it became necessary thereafter to do something to prevent the recurrence of like troubles.

We cannot read the evidence in this case without reaching the conclusion that the trouble between the parties at Frederick had engendered a feeling of hostility on the part of the representatives of the union towards the plaintiff, which possibly rendered them indifferent to any injury the plaintiff might suffer incidentally caused by any lawful action taken by the representatives to advance the interests of the members of the union, or to better enable the union to carry out in a lawful manner the objects and purposes for which the organization was created. Yet upon such evidence we do not feel warranted in holding as untrue the denial of those representatives that they acted wantonly and maliciously, with the intention to injure and destroy the plaintiff's business.

That the acts were not wrongful or unlawful is shown, we think, by the statement of the law applicable thereto, which is found in the decision in *Klingel's Pharmacy v. Sharp & Dohme*, 104 Md. 232, 64 A. 1029, 1031, in which the court, speaking through Judge McSherry, said: "'It is a part of every man's legal rights,' said Judge Cooley, 'that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice, or malice.' *Cooley, Torts*, 278. Again: 'The exercise by one man of his legal right cannot be a legal wrong to another. * * * Whatever one has a legal right to do another can have no right to complain of.' *Id.* 688. It was upon this principle that the decision in *Bohn Manf. Co. v. [Hollis], N. W. Lumbermen Assn.*, 54 Minn. 223, 55 N. W. 1119, was placed. In that case a large number of retail lumber dealers formed a voluntary association by which they mutually agreed that they would not deal with any manufacturer or wholesale dealer who should sell lumber directly to consumers, not dealers, at any point where a member of the association was carrying on a retail yard, and they provided in their by-laws that, whenever any wholesale dealer

or manufacturer made any such sale, the secretary of the association should notify all the members of the fact. The plaintiff having made such a sale, the secretary threatened to send notice of the fact to all the members of the association, and it was held that no action would lie, and that there was no ground for an injunction. There was nothing unlawful in this. Each member of the association had the legal right to refuse to sell the lumber which he owned, if he saw fit to refuse, and the collective refusal of all the members was equally lawful. So, too, the defendants in this case had a perfect legal right to refuse to sell to the plaintiff any drugs and druggists' supplies owned by them, and it would have been wholly immaterial whether that refusal was the result of whim, caprice, prejudice, or malice, if the bare refusal to sell had been the head and front of their offending. But the refusal to sell was not the exercise of a legal right, if that refusal were a mere step in the development and enforcement of a scheme to forestall the market in restraint of trade, or to drive the plaintiff into becoming a member of an organization which would control the prices he could charge for his wares and which would thereby deprive him of the liberty to contract for the sale of his goods according to his own judgment of their value. Whilst an act which is in itself lawful can never become unlawful simply because it may be done by several persons instead of by only one, yet the same act may be unlawful when it is a means of accomplishing an unlawful end. An act performed in furthering an unlawful enterprise cannot be a lawful act, though the same act would be free from censure if done with some other view."

It is true that in that case the refusal to sell was held not to be an exercise of a legal right, as it was there adjudged to be a "mere step in the development and enforcemnt of a scheme to forestall the market in the restraint of trade, or to drive the plaintiff into becoming a member of an organization" which controlled prices. The reasons given in that case for holding the refusal to sell unlawful are not shown to exist in this case. Upon the facts and circumstances of this case, the refusal to accept employment from the plaintiff, who had

violated the rules of the union, was not an attempt to forestall the market in restraint of trade, within the meaning of that term, or to drive the plaintiff into becoming a member of the organization. But, as claimed by the defendant, the refusal of the union to accept employment from it was for the sole purpose of advancing the interests of the union, and to prevent the recurrence of conditions that were harmful to the organization in carrying out the purposes for which it was organized, including the right of collective bargaining.

Whether an order of a union directing its members not to serve a particular employer is lawful is discussed in 16 *R. C. L.* 448, where it is said: "In a number of decisions the question has been raised whether it is lawful for a labor union to order its employees not to serve a particular employer. One court has reached the conclusion that the imposition of fines upon members of a labor union to compel them to join a strike has the effect of intimidating such persons and is therefore unlawful. (*L. D. Willcutt, etc., Co. v. Driscoll,* 200 Mass. 110, 85 N. E. 897, 23 L. R. A. (N. S.) 1236.) But this conclusion is opposed to practically all of the decisions on the subject. The decisions are practically in harmony in holding that it is within the power of labor unions, and it is lawful for them, to instruct or order their members not to accept employment with an individual, or to continue in such person's employment, where the action of a union is justifiable in the sense that it is to promote the welfare of the members of the union. Accordingly, the enforcing of a by-law forbidding members of the union to serve one who has broken a contract with its members does not amount to intimidation. Neither a fine or other disciplinary action under such by-law would be unlawful as to members who voluntarily subject themselves to the provisions of such by-law. They are left free to enter the employment of the prescribed employer, although practically they are compelled to choose between the benefits of such employment and membership in the union. (*Rhodes Bros. Co. v. Musicians' Protective Union Local No. 198, etc.,* 37 R. I. 281, 92 A. 641, L. R. A.

1915E, 1037 and notes.) Similarly, it has been decided that a labor union may lawfully order its members not to work on premises where work is being done by employers who are deemed to be unfair to union labor."

This question was also discussed in *McCarter v. Chamber of Commerce,* 126 Md. 131, 94 A. 541, 543, where reference was made to *Bohn Mfg. Co. v. Hollis, supra,* the facts of which were reviewed and the finding of the court approved in *Klingel's Pharmacy v. Sharp & Dohme, supra.* On the question as to whether the by-law providing for expulsion was coercive, the court said: "But this involved no element of 'coercion' or 'intimidation,' in the legal sense of those terms. * * * Nor was any coercion .proposed to be brought to bear on the members of the association, to prevent them from trading with the plaintiff. After they received the notices, they would be at entire liberty to trade with plaintiff, or not, as they saw fit. By the provisions of the by-laws, if they traded with the plaintiff, they were liable to be 'expelled'; but this simply meant to cease to be members. It was wholly a matter of their own free choice which they preferred—to trade with the plaintiff, or to continue members of the association." In support of the principle of law here enunciated, see *Adair v. United States,* 208 U. S. 172, 28 S. Ct. 277, 52 L. Ed. 436; *Cooley on Torts,* p. 278; *Sorrell v. Smith* (1925), A. C. 700; *Coppage v. Kansas,* 236 U. S. 1, 35 S. Ct. 240, 59 L. Ed. 441; *N. J. Painting Co. v. Local No. 26, etc.,* 96 N. J. Eq. 632, 126 A. 399; *Barker Painting Co. v. Brotherhood* (C. C. A.), 15 F. (2nd) 16; *Scott-Stafford Opera House Co. v. Minneapolis Musicians' Assn.,* 118 Minn. 410, 136 N. W. 1092; *National Protective Assn. v. Cumming,* 170 N. Y. 321, 63 N. E. 369; *Saulsberry v. Coopers' International Union,* 147 Ky. 170, 143 S. W. 1018; *My Maryland Lodge v. Adt,* 100 Md. 249, 59 A. 721.

The questions presented and decided in the earlier case between the same parties, reported in 160 Md. 483, 154 A. 52, are altogether different from the questions presented in this case. In that case, the members of the union were at the

time employed by Seymour Ruff & Sons, Inc., in the erection of a building, the work on which was being done by it under an existing contract with the general contractor, Culler. A strike was called, not to discipline Ruff & Sons, Inc., with whom there was no controversy, but to induce a breach of the contract between Ruff and the general contractor, in an effort to compel the latter to discontinue the employment of non-union men upon other work then being done by him.

It was upon these facts that the court held that a right of action existed, saying: "Organized labor's right of coercion and compulsion is limited to strikes on persons with whom the organization has a trade dispute." In this case there is no existing contract, so far as the record discloses, by which the plaintiff would be injuriously affected by the refusal of the defendants to accept employment from it, nor is there a strike or a third party involved in the controversy; the controversy being with the plaintiff only.

Entertaining the views we have expressed as to the legal rights of the parties here involved, the decree appealed from will be affirmed.

*Decree affirmed, with costs to the appellee.*

PARKE, J., dissents.