TONY GREEN ET AL. *v.* AARON SAMUELSON ET AL.
[No. 27, January Term, 1935.]

*Decided April 2nd, 1935.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, SHEHAN, and JOHNSON, JJ.

*W. A. C. Hughes, Jr.,* with whom were *Warner T. McGuinn and McGuinn & Hughes* on the brief, for the appellants.

*Leonard Weinberg* and *Harry J. Green,* with whom were *Herman Samuelson, Oscar Samuelson,* and *Weinberg & Sweeten,* on the brief, for the appellees.

SLOAN, J., delivered the opinion of the Court.

The question here is, Can a race, in this case a group of negroes, by picketing, impose their will on a white merchant and compel him to employ colored, instead of white, clerks?

In August, 1933, a negro named Kiowa Costonie came to Baltimore and set himself up in business as a "healer," doing his work in colored churches. He was also known as "Tony Green," a name which he says he acquired in vaudeville about seven years ago. In Baltimore, as in many other cities, there is a large and much congested section of the city inhabited almost wholly by negroes. They constitute more than a seventh of the entire population of the city. Naturally they have become of considerable commercial importance, and the principal stores in this section are owned and conducted by white merchants. For one of two reasons or motives, one to promote his own interest, the other to advance and help his race, Costonie conceived the idea that the merchants who sup-

plied his people with merchandise should employ none but colored clerks, and resort was had to the boycott to enforce his demands. He was successful in his first effort, which was directed against the A. and P. Stores, where the following circular was used:

"November 2, 1933.

"Demands:

"1. Every store operated in colored neighborhoods to have all colored employees except manager. Calls for thirty-four men.

"2. By January 1st—in three stores we want colored managers.

"3. All boys who were hired Saturday by A. & P. stores must be dismissed, entirely.

"I can be reached at Lafayette 1208 when you are ready to give us definite action.

Citizens Committee,

Kiowa Costonie."

The A. and P. Stores in the neighborhood, according to the district manager, in a week or two yielded to the pressure exerted and complied with the demands. The efforts of Costonie were then directed toward four merchants, Aaron Samuelson, trading as Tommy Tucker 5 & 10 Cent Store, at 1707 and 1709 Pennsylvania Avenue, employing ten to twelve sales girls; Samuel Silverman and Harry Silverman, trading as Silverman Bros., at 1713 Pennsylvania Avenue; Max Meyers, trading as Goodman's, who has a shoe store at 1735 Pennsylvania Avenue; and Samuel Cohen, trading as Capital 5 and 10 Cent Store, at 1803 Pennsylvania Avenue, all of whom testified that they had been threatened by Costonie and others, particularly by Lillian Jackson and Elvira Bond, who, with Costonie, seemed to be the leaders in the movement, that they would boycott them unless they put in one hundred per cent. colored help. Isaac Goodman, who has a retail variety store at 1610 Pennsylvania Avenue, who had employed at Costonie's solicitation some colored help, testified: "Before the picketing started, Costonie came in again and said, Goodman, the best thing you can

do is to put in one hundred per cent. colored help in this store. I told him I had fifty-fifty and he said that wasn't satisfactory; he said, now tomorrow all hell is going to turn loose and my advice to you is to put in one hundred per cent. colored help. He said, Now I am giving you a tip. That was the day before the picketing started." He said he then had eight colored and two white employees; that he was in sympathy with the movement, but did not approve of Costonie's tactics. Costonie and his association then proceeded to put their promises or threats into execution by picketing all of the stores named except Goodman's. Costonie denied that he had threatened Goodman or any others concerned.

There is no evidence of any physical violence or disturbance of the peace, but it did result in large crowds assembling in the territory picketed, particularly when a school in the vicinity let out at or about 4 o'clock in the afternoon and the children tarried there. The police were called and took charge of the situation, and the picketers and crowd were kept moving. That the boycott was effective was evidenced by the paralysis of the merchants' business—it practically disappeared. The pickets carried banners and placards with such slogans as, "Don't buy where we can't work." "Don't go into the following stores until all colored help goes in: Tommy Tucker, Dolly Dimple and Green Dress Shop," owned by Samuelson. Meyers put a sign in his window, "We are O. K." The crowd flocked into his place, and asked who O. K.'d him, and signs came out in the afternoon that "Meyers is not O. K.," and, as Sergeant Schlenker testified, "that went on from day to day," until the four heretofore mentioned filed a bill praying an injunction to restrain Costonie and twenty-seven others and three organizations, known as the National Housewifes' League, the Housewifes' League, and the Young People's Forum, from so interfering with the plaintiffs' business. The bill was filed December 15th, 1933, and an order for injunction passed the same day, with the provision for the usual five days' notice for a motion to dissolve the injunction.

On January 2nd, 1934, an answer was filed admitting the organization for the purpose of furthering the employment of colored help in the stores mentioned, and that picketing was resorted to and banners displayed, but never by any authorized pickets exceeding fifteen in number, and denying that they "threatened, intimidated, coerced or interfered with the plaintiffs, their business, or their customers," and, denying that they "coerced, intimidated or forced" storekeepers in the immediate neighborhood of the plaintiffs to "discharge white employees and to hire in their stead negro employees." No testimony was taken for about nine months, after which a decree was passed making the temporary injunction permanent in favor of all plaintiffs except Samuel Cohen, as to whom the bill was dismissed, and from this decree the defendants appealed.

Enough of the facts have been told to show just what the case is and to come to a decision. The appellants assume that the decisions of this court with respect to labor disputes apply with equal force to the facts of this case, and, if this court so treated the question, there would be abundance of precedents in this state and authority elsewhere to decide the question here submitted. *Ruff & Sons v. Bricklayers' etc. Union,* 163 Md. 687, 164 A. 752; *Bricklayers' etc. Union v. Seymour Ruff & Sons,* 160 Md. 483, 495, 154 A. 52; *International Pocketbook Workers v. Orlove,* 158 Md. 496, 148 A. 826; *Blandford v. Duthie,* 147 Md. 388, 128 A. 138; *My Maryland Lodge v. Adt.* 100 Md. 238, 59 A. 721.

So far as we are able to ascertain, this is the first time the question here presented has arisen in an appellate court, and our information is that the case in the court appealed from is the first time it has been presented to any tribunal. About a month after the bill was filed in the Circuit Court of Baltimore City a similar bill was filed in New York *(Beck Shoe Corporation v. Johnson,* 153 Misc. 363, 274 N. Y. S. 946), and both chancellors declined to regard the question as a labor dispute, and, on the ground of public policy, granted the relief prayed by

the bills for injunction. They have already excited some attention, as will appear from 83 Pennsylvania Law Review 381, and 48 Harvard Law Review 691.

The defendants contend that this case is, or is akin to, a labor dispute, because their purpose is to secure employment for members of their race and thus improve its condition, and that it has such a justifiable cause as to warrant their actions in enforcing their demands by the method commonly called "picketing." *International Pocketbook Workers v. Orlove*, 158 Md. 496, 148 A. 826. They disclaim any intention or purpose of depriving the plaintiffs' employees of their positions or livelihood, yet, if successful, their activities could have no other result. It is not denied that there is no quarrel or dispute between employers and employees and none between the defendants and those employees. Their grievance is that the defendant merchants depend almost wholly on colored patronage for their existence and that these merchants do nothing for them in return. That there is some merit in their complaint cannot be disputed, as the planting of a white store in an exclusively colored community is an exploitation of the inhabitants for profit, but the defendants cannot right their wrongs by means that are unlawful. The defendants and others of their race have a perfect right to buy where they please. Nor is there anything "unlawful in the action of a combination who by concerted action cease to patronize a person against whom a concert of action is directed when they consider it is to their interest to do so." 12 *C. J.* 574; Code, art. 27, sec. 43.

The principles applied in *Klingel's Pharmacy v. Sharp & Dohme*, 104 Md. 218, 64 A. 1029, in which the parties were the reverse of the instant case, are equally applicable here. That case came upon demurrer to the declaration, which had been sustained. The declaration charged the defendants, who are manufacturing and wholesale druggists, with entering into a combination and conspiracy to coerce the dealers in drugs and druggists' supplies to maintain a certain schedule of prices and to threaten by boycott and black list dealers who refused or

would not agree to maintain such prices; that Sharp & Dohme and the Calvert Drug Company had refused to sell drugs to Klingel's Pharmacy as a direct result of the unlawful combination and conspiracy between them and the Retail Drug Association, all done with the intention to injure and destroy the plaintiff's business, which it did, and which were sustained as a direct result of the illegal, malicious, and wrongful conspiracy, and as a result of the acts done in furtherance thereof. Of the charge that two of the defendants had refused to sell to the plaintiff, this court said they had a right not to sell, unless the refusal was not done in a criminal conspiracy in restraint of trade, and, quoting *Cooley on Torts,* 278, said: "It is a part of every man's legal rights * * * that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice, or malice."

Of the conduct of the defendants in the case of *Klingel's Pharmacy v. Sharp & Dohme,* this court said: "Is such an interference with the legal right of an individual to conduct a lawful business in a lawful way tolerated by the law? And can it be permitted to flourish unscathed because no open deeds of violence or breaches of the peace have been committed? It would be a reproach to the law if such were the case. A boycott means the confederation, generally secret, by many persons whose intent is to injure another by preventing all persons from doing business with him through fear of incurring the displeasure, persecution, and vengeance of the conspirators. 8 *Cyc.* 639 [12 *C. J.* 574]. The courts have generally condemned these combinations which are formed for the purpose of interfering, otherwise than by lawful competition, with the business affairs of others, and depriving them by means of threats and intimidations of the right to conduct the business in which they are engaged according to the dictates of their own judgment."

Or, as said in *My Maryland Lodge v. Adt,* 100 Md. 238, 249, 59 A. 721, 723, in which there was a demurrer

to a bill to restrain the boycott of a machine shop: "The right of an individual to carry on his business as he sees fit, and to use such implements or processes of manufacture as he desires to use, provided he follows a lawful avocation and conducts it in a lawful manner, is entitled to as much consideration as his other personal rights; and the law should afford protection against the efforts of powerful combinations to rob him of that right and coerce his will by intimidating his customers and destroying his patronage. *Hopkins v. Oxley Stave Co.*, 83 Fed. 912, 28 C. C. A. 99; 8 *Cyc.* 640. * * * "The plaintiff was engaged in a lawful business, and was carrying it on in a lawful way. * * * The law protects him in his right to employ whom he pleases, at prices which he and his employees can agree upon, and he has the further right to discharge them at the expiration of their term of service or for violation of their contract. This right must be conceded, or personal liberty is a delusion."

The defendants do not contend that this is a labor dispute as commonly recognized, but, to justify their actions in instituting a boycott carried on by picketing, they invoke the rules applied in such disputes. There is no question here involved of hours, wages, working conditions, or the right to organize. Whatever of organization there is is made up of colored men and women of various professions, occupations, and callings, to promote the interests of the colored race generally by obtaining employment for its people. The general purpose of colored persons to improve the condition of their race may not be improper, but they must adopt lawful means to accomplish this end, and must not resort to intimidation and threats, which may easily lead to breach of the peace and physical violence. As said in *My Maryland Lodge v. Adt,* 100 Md. 238, 249, 59 A. 721, 723; "They have an unquestionable right to present their cause to the public in newspapers or circulars in a peaceable way, but with no attempt at coercion. If ruin to the employer results from their peaceable assertion of these rights, it is a damage without remedy. But the law does not permit either employer or employee to use force, violence,

threats of force or threats of violence, intimidation, or coercion."

They may, by organization, public meetings, propaganda, and by personal solicitation, persuade white employers to engage colored employees and induce their people to confine their trade to those who accede to their wishes, and whether they succeed or fail will depend on the co-operation of their people.

The complaint here is not with the thing intended to be done but the means employed to do it. The case immediately before us is the effort of a race to improve its condition in a section of a large city inhabited almost exclusively by one race, and no way has been pointed out to us, and we know of none, whereby the courts can make a rule to apply to the conditions there existing which would not be applicable where the same racial conditions do not exist. If we say that what was being done in the seventeen hundred block on Pennsylvania Avenue in Baltimore was proper, then it can be done in any other block in the city; there cannot be one law for Pennsylvania Avenue and another for streets where the white races predominate and trade, and the courts, in laying down a rule of conduct, must not only consider what has been done but what may be done in consequence of it.

In our opinion, this is a racial or social question, and as such, the rules heretofore announced and applied to labor disputes have no application, and the things complained of were properly enjoined, but as the writ of injunction is broader than the facts in evidence, and restrains the defendants from doing anything which may indirectly tend to injure the plaintiff's business, the case will be remanded that the defendants may, if they wish, apply for a modification of the writ and decree to conform with this opinion.

> *Decree affirmed in part and reversed in part, each side to pay one-half the cost of printing briefs, the appellants to pay other costs.*