NEW NEGRO ALLIANCE et al. v. SANITARY GROCERY CO., Inc.*

No. 6836.

United States Court of Appeals for the District of Columbia.

Argued April 12, 1937.
Decided July 26, 1937.

B. V. Lawson, Jr., of Washington, D. C., for appellants.

A. Coulter Wells and William E. Carey, Jr., both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

VAN ORSDEL, Associate Justice.

This appeal is from a final order and decree of the District Court of the United States for the District of Columbia, permanently enjoining the New Negro Alliance, a corporation, and two of its officers, William H. Hastie and Harry A. Honesty, from picketing or boycotting retail grocery stores of the appellee, Sanitary Grocery Company, Inc. The case was finally disposed of on bill and answer.

The appellee is a corporation operating a large number of retail grocery stores in the District of Columbia. Appellant the new Negro Alliance is a corporation composed of colored persons, its objects being the mutual improvement of its members and the promotion of civic, educational, benevolent, and charitable enterprises. The individual appellants are

*Writ of certiorari granted 58 S.Ct. 270, 82 L.Ed. ——

the administrator and deputy administrator of the New Negro Alliance.

The single question here involved is whether appellants, who admit that the relation of employer and employee does not exist between them and the appellee, and that they are not engaged in any competitive business with the appellee, have a legal right to picket and boycott the stores of the appellee for the purpose of compelling it to engage and employ colored persons in the sales positions connected with the operation of its business.

The court below entered a decree restraining the appellants from picketing or boycotting or by inducements or threats or intimidation or the use of physical force from preventing or hindering persons who desire or intend to enter the place of business of appellee from entering and transacting business with appellee. The bill charges that the appellants had made arbitrary and summary demands that appellee engage and employ colored persons in managerial and sales positions in its store and had written letters to appellee which contained threats of boycotting and ruination of appellee's business, and that upon the refusal of appellee to comply, appellants, their members, representatives, etc., had unlawfully conspired to picket, patrol, boycott, and ruin appellee's business. Specific acts are alleged as follows: Picketing in front of the store with signs containing the words, "DO YOUR PART! BUY WHERE YOU CAN WORK! NO NEGROES EMPLOYED HERE!" That these pickets had jostled and collided with persons in front of the store and physically hindered, obstructed, and interfered with persons desiring to enter appellee's place of business; that the pickets are disorderly while picketing and attract crowds, and when crowds are attracted encourage them to prevent persons from entering appellee's place of business; that appellants in concert have induced to be published in Washington Negro newspapers notices to the effect that appellee: "IS FIRING NEGRO PERSONNEL—ORGANIZATION PLANS TO PICKET UNLESS DEMANDS ARE MET." And again: "SANITARY STORE PICKETED BY ALLIANCE FOR REFUSAL TO EMPLOY NEGRO CLERKS." And again: "HOUSEWIVES BEING CANVASSED BY GROUP BUY-WHERE-YOU CAN-WORK CAMPAIGN CARRIED TO RESIDENTS IN NEIGHBORHOOD." And again, "that the Alliance is conducting a house-to-house canvass in the vicinity of the new store and residents in the neighborhood are urged to 'buy where you can work.'"

The answer denies the conspiracy charged, and likewise denies physical coercion or intimidation, and admits that the relation of employer and employee does not exist, and likewise admits that the parties are not engaged in competitive business.

Appellants' appeal in this court is grounded on their claim that peaceful picketing is not illegal.

The legislatures and the courts have gone far in sustaining peaceful picketing where labor disputes are involved. By the rather sweeping Act of March 23, 1932 (47 Stat. 70, sections 101–115, T. 29, U.S.C. [29 U.S.C.A. §§ 101–115]), the Congress prohibited the federal courts from restraining peaceful picketing in cases involving "labor disputes."

Section 13 of the act (section 113, T. 29, U.S.C. [29 U.S.C.A. § 113]) defines "labor disputes," as comprehended within the terms of the act, as follows:

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined).

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in

whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

We agree with the trial court that the instant controversy does not involve a labor dispute within the statute. In this view the distinction between pickets attempting by verbal persuasion to interfere with the business of and to prevent dealing with the establishment boycotted, and pickets silently displaying cards bearing inscriptions intended to accomplish the same object, is of little importance, since both constitute an interference not only with the business boycotted but with the public use of the street. Its purpose in either case, when induced by concerted action on the part of a great mass of people, is so to interfere with the business of appellee as to compel it to surrender its free right to choose its employees and to conduct its business in whatever lawful manner it may elect. These are rights of which it cannot be deprived under the facts and circumstances here disclosed.

The tendency of the picketing and the action taken to make it effective disclosed in this case is to deter peaceful citizens, both men and women, from entering the appellee's place of business, and to deprive them of their lawful rights. To say under such circumstances that the picket consists of nothing more than a peaceful endeavor to prevent customers from entering the boycotted place is to make a statement at variance with the facts. Cf. Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375.

With the admission of appellants that there is no relation of employer and employee existing, and that appellants are not engaged in a competitive business with appellee, the case narrows down to whether or not appellants come within subparagraph (c) of the above-quoted statute, and in conducting this picketing are attempting to negotiate, fix, maintain, change, or arrange terms or conditions of employment. As we have said, we think

that the statute will not admit of so broad a construction. Every person conducting a legitimate business is entitled to select his own employees. When employees are selected and become engaged in the business, then any differences which may arise between the employer and employee, or any organization in which the employee may be a member, may come within the provisions of the statute; but until such relation becomes established no ground exists for what may be called a labor dispute. If appellants are upheld in picketing in this case, they might picket any private residence which employed white rather than negro servants. The illustration indicates the extreme to which the contention of the appellants, if upheld, might be carried.

We are clearly of the opinion that this is not a labor dispute. It is a racial dispute in which appellants have admittedly confederated together to impose on appellee definite terms in the employment of its help. In A. S. Beck Shoe Corporation v. Johnson, 153 Misc. 363, 274 N.Y.S. 946, 953, an association of negroes picketed stores of the shoe corporation, bearing signs reading: "An Appeal. Why spend your money where you can't work? This is foolish. Stay out. Citizens League for Fair Play." These signs were similar to the placards carried by the pickets in the instant case. The court in that case said:

"The controversy here is not a labor dispute. The defendants do not constitute a labor union or a labor organization of any kind. They do not compose, nor are they all members, of any single trade or class of trades. Their demands are not connected with any one industry. The questions about which they are now picketing have no connection with wages, hours of labor, unionization, or betterment of working conditions.

"It is solely a racial dispute. It is born of an understandable desire on the part of some of the negroes in this community that the stores in their neighborhood where they spend their money should employ a percentage of negro help. Their exclusive concern is that a certain number of white persons be discharged in order to make place for members of their own race.

"* * * The acts of the defendants are irreparably injuring the plaintiff's business. Not only do they tend to keep

prospective colored customers out of the store of the plaintiff, but they must necessarily have the effect of keeping out prospective white customers also. The purpose of the defendants in having members of one race discharged in order to employ the members of another race will not justify this direct damage to the plaintiff in the conduct of its business."

The court in that case was considering a situation identical with that here presented, and the reasoning of the court in its opinion we regard as sound.

In a case analogous to the instant case, Green v. Samuelson, 168 Md. 421, 178 A. 109, 99 A.L.R. 528, there was involved the picketing of stores in a colored section of the city of Baltimore by an organization of negroes similar to the appellant corporation. In that case the Court of Appeals of Maryland, in upholding the issuance of an injunction, said, 168 Md. 421, at pages 425, 426, 429, 178 A. 109, 111, 99 A.L.R. 528:

"So far as we are able to ascertain, this is the first time the question here presented has arisen in an appellate court, and our information is that the case in the court appealed from is the first time it has been presented to any tribunal. About a month after the bill was filed in the Circuit Court of Baltimore City a similar bill was filed in New York, Beck Shoe Corporation v. Johnson, 153 Misc. 363, 274 N.Y.S. 946, and both chancellors declined to regard the question as a labor dispute, and, on the ground of public policy, granted the relief prayed by the bills for injunction. * * *

"In our opinion, this is a racial or social question, and as such, the rules heretofore announced and applied to labor disputes have no application, and the things complained of were properly enjoined."

However commendable the purposes of the appellants may be in attempting to improve the condition of their race, they are not, in carrying out such purposes, justified in ignoring the rights of the public and the property rights of the owner of the business which they attempt to boycott. To sustain such action on the part of an organization established merely to advance the social standing of its race would be in complete disregard of fundamental principles of public policy, and

cannot be supported upon any principle of law, equity or justice.

The decree is affirmed.

STEPHENS, Associate Justice, dissenting in part, concurring in part:

I dissent from the dictum of the majority that no labor dispute exists within the meaning of the Norris–LaGuardia Act [47 Stat. 70, 29 U.S.C.A. §§ 101–115] until differences arise between the employer and the employee or any organization in which the employee may be a member. Cinderella Theater Co. v. Sign Writers' Local Union (D.C.) 6 F.Supp. 164; Dean v. Mayo (D.C.) 8 F.Supp. 73; cf. Levering & Garrigues Co. v. Morrin (C.C.A.) 71 F.(2d) 284, certiorari denied 293 U.S. 595, 55 S.Ct. 110, 79 L.Ed. 688; see Legislation Note, The Norris-LaGuardia Act: Cases Involving or Growing Out of a Labor Dispute (1937), 50 Harv.L.Rev. 1295. The dictum would exclude from the operation of the Norris-LaGuardia Act a dispute between two unions as to the right to represent employees, the employer being indifferent as to the result, and would also exclude from the operation of the Act a dispute as to unionization between a union and an employer of exclusively non-union labor. Neither of such types of disputes is involved in the instant case, and we should therefore not even in dictum rule concerning them.

I dissent from the affirmance of that part of the decree which as worded enjoins the appellants from boycotting the appellee. I think it was erroneous for the trial court in effect to order the appellants to trade at the appellee's store.

I concur with the majority in the conclusion that in the instant case the Norris-LaGuardia Act does not prevent the issuance of an injunction. The dispute in the instant case is not, I think, a labor dispute within the definition given to that phrase in the Norris-LaGuardia Act—even under the most liberal construction of that Act. E. g., Cinderella Theater Co. v. Sign Writers' Local Union, Dean v. Mayo, Levering & Garrigues Co. v. Morrin, all supra. See Legislation Note, supra, 1301 n. 32. Therefore the trial court had jurisdiction to issue an injunction.

I feel bound to concur further with the majority in the conclusion that in the instant case the injunction was prop-

erly issued. I do so with reluctance for I think courts should be cautious indeed in limiting application of the general proposition so happily stated by Justice Hofstadter, in Julie Baking Co. v. Graymond, 152 Misc. 846, 274 N.Y.S. 250:

"The right of an individual or group of individuals to protest in a peaceable manner against injustice or oppression, actual or merely fancied, is one to be cherished and not to be proscribed in any well-ordered society. It is an essential prerogative of free men living under democratic institutions. And it is salutary for the state, in that it serves as a safety valve in times of stress and strain. . . ." [152 Misc. 846, at page 847, 274 N.Y.S. 250, at pages 251–252]

But this proposition was uttered in a case which though it did not involve a labor dispute also did not involve a racial dispute. It was a dispute between a neighborhood organization and a bakery concerning alleged extortionate prices.

How far a right may be exercised, or how far it is proper to limit its exercise, is a question of policy and one which, however delicate, must nevertheless be determined by courts according to their best judgment—in the absence of some controlling statute. The questions of policy involved in picketing in labor disputes have been thought by Congress, in the Norris-LaGuardia Act, and by many courts, to operate against restraint of peaceful picketing.[1] Peaceful picketing has been recognized as legal, however, not upon the theory that it is not an invasion of another's right but upon the theory that it is a justifiable invasion. As said by Mr. Justice Holmes in Aikens v. Wisconsin, 195 U.S. 194, 204, 25 S.Ct. 3, 49 L.Ed. 154:

". . . *prima facie*, the intentional infliction of temporal damage is a cause of action, which, as a matter of substantive law . . . requires a justification if the defendant is to escape."

And, as said the same author in Privilege, Malice, and Intent (1894), 8 Harv.L.Rev. 1, 9:

". . . when a responsible defendant seeks to escape from liability for an act which he had notice was likely to cause temporal damage to another, and which has caused such damage in fact, he must show a justification. The most important justification is a claim of privilege. In order to pass upon that claim, it is not enough to consider the nature of the damage, and the effect of the act, and to compare them. Often the precise nature of the act and its circumstances must be examined. It is not enough, for instance, to say that the defendant induced the public, or a part of them, not to deal with the plaintiff. . . . in all such cases the ground of decision is policy; and the advantages to the community, on the one side and the other, are the only matters really entitled to be weighed. . . ."

The problem of policy has also been well put thus:

"The truth to be dealt with is that every measure upon which a labor union relies for acceptance of its demands, involves the curtailment of some temporal interest of employer, non-union employee, and frequently the public. . . .

* * *

"The damage inflicted by combative measures of a union—the strike, the boycott, the picket—must win immunity by its purpose. But neither this nor any formula will save courts the painful necessity of deciding whether, in a given conflict, privilege has been overstepped. The broad questions of law—what are permissible purposes and instruments for damage,—and the intricate issues of fact to which they must be applied, together constitute the area of judicial discretion within which diversity of opinion finds ample scope. . . ." [Frankfurter and Greene: The Labor Injunction (1930), at 24, 25]

One of the main factors of policy which must be weighed in judicial determination of whether an injunction shall issue to restrain picketing is the probability of violence in the particular circumstances involved. The decisions legi-

---

[1] The Norris-LaGuardia Act denies jurisdiction to enjoin "Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence." 47 Stat. 71, 29 U.S.C.A. § 104(e). And see the following decisions: Senn v. Tile Layers' Protective Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229; Iron Molders' Union v. Allis-Chalmers Co. (C.C.A.) 166 F. 45, 20 L.R.A.(N.S.) 315; Exchange Bakery & Restaurant, Inc. v. Rifkin, 245 N.Y. 260, 157 N.E. 130.

timatizing peaceful picketing in labor disputes have been based in part upon the proposition that picketing can be carried on in such manner as not imminently to endanger the public peace and safety, and in part upon the further proposition that the likelihood of violence in picketing in labor disputes is not sufficient to overweigh the public interest in picketing as one means of accomplishing improvement of labor conditions. In the instant case, the factor of the likelihood of violence operates I think to require an opposite conclusion. The dispute here is in essence and emphasis not a labor dispute but a racial dispute. True, it is a racial dispute concerning hiring, and has thus in a broad sense to do with a question of labor; but this does not make it less racial in essence and in insistence. Violence in racial disputes is, as a matter of common knowledge, highly probable. Therefore, as a matter of public policy, picketing in such disputes cannot be justified, even though in its inception, as in the instant case, it is actually peaceful.