## QUALITY DISCOUNT TIRES, INC. *v.* THE FIRESTONE TIRE & RUBBER COMPANY

[No. 47, September Term, 1977.]

*Decided January 31, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*George W. Liebmann*, with whom was *Shale D. Stiller* on the brief, for appellant.

*Paul V. Niemeyer*, with whom were *Lewis A. Noonberg*, *Edward F. Magee* and *Piper & Marbury* on the brief, for appellee.

ELDRIDGE, J., delivered the opinion of the Court.

This is the first case to reach this Court involving the Maryland Antitrust Act, Maryland Code (1975, 1977 Cum. Supp.), §§ 11-201 — 11-213 of the Commercial Law Article. The plaintiff in a private action under that statute here challenges the granting of the defendant's motion for a directed verdict.

The testimony developed at trial tended to establish that in September 1972, Quality Discount Tires, Inc., the plaintiff, entered into a dealership agreement with the Firestone Tire and Rubber Company, the defendant.[1] According to the terms of the agreement, Firestone, *inter alia*, was obligated to sell tires to Quality at the "Company's regular Direct Dealer Prices" and to allow Quality to participate, along with other dealers, in cooperative advertising paid for in part by Firestone. This agreement could be cancelled by either party without cause upon 60 days' written notice.

In March 1973, Quality was excluded from Firestone's advertising program. In April 1973, Quality instituted this action in the Circuit Court for Baltimore County under the Maryland Antitrust statute, seeking damages for the exclusion from the advertising program. Quality alleged that this exclusion was in furtherance of a price-fixing arrangement and that Firestone, consequently, had violated § 11-204 (a) (1) which prohibits a person, by contract, combination, or conspiracy with one or more other persons,

---

1. Firestone markets its products in a variety of ways, including Firestone "dealers," which are independently owned retail establishments franchised by Firestone, and Firestone "stores," which are company owned and operated retail outlets.

from unreasonably restraining trade or commerce. Specifically, Quality brought the action pursuant to § 11-209 (b) (2), which provides that a "person whose business or property has been injured ... by a violation of § 11-204 may maintain an action for damages ... against any person who has committed the violation." In May 1973, Firestone gave formal notice to Quality that it would be terminated as a Firestone dealer, effective July 1973. Quality then amended its declaration, seeking damages for the termination of its dealership as well as for its exclusion from the cooperative advertising.

Thereafter, following extensive discovery, the case came on for trial. At the close of the plaintiff's evidence, the trial court granted Firestone's motion for a directed verdict on the grounds (1) that Quality had failed to establish any violation of § 11-204 (a) (1), and (2) that Quality had failed to establish that it had been damaged by Firestone's actions.

Quality took an appeal to the Court of Special Appeals. Before any proceedings in that court, we granted Quality's petition for a writ of certiorari. Quality argues that the motion for directed verdict was improperly granted. In addition, Quality argues that several pre-trial orders relating to discovery and other procedural matters were in error.

(1)

*Whether There Was Evidence of a Statutory Violation*

In 1972, the General Assembly adopted the Maryland Antitrust Act.[2] The purpose of the Act is to "complement the body of federal law governing restraints of trade," and the General Assembly stated its intent that "in construing this subtitle, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters." Section 11-202 (a).

---

2. For a general discussion of the provisions of the Act, *see* Reynolds and Wright, *A Practitioner's Guide to the Maryland Antitrust Act*, 36 Md. L. Rev. 323 (1976).

In the instant case, Quality alleges that Firestone violated § 11-204 (a) (1) of the Act, which provides that "[a] person may not . . . [b]y contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce . . . ." The federal analogue to this provision is § 1 of the Sherman Antitrust Act of July 2, 1890, 26 Stat. 209, as amended, 15 U.S.C. 1, which states that every "contract, combination . . . or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." Quality maintains that its termination as a Firestone dealer was an act by Firestone in furtherance of a "contract, combination, or conspiracy" among Firestone and several Firestone dealers in the Baltimore metropolitan area; that the purpose and result of this conspiracy or arrangement was "restraint of trade" in the form of resale price maintenance of Firestone products; and that its termination was, as a consequence, in violation of the Maryland Antitrust Act.

The trial judge, in granting Firestone's motion for a directed verdict, stated: "There is no evidence in this case to submit to a jury of 'a conscious commitment to a common scheme' that would in any way show that there was a contract, combination, or any type of conspiracy."

In ruling on a motion for a directed verdict, a court is required to "assume the truth of all credible evidence in the case tending to sustain the contentions of the party against whom the verdict is directed as well as all inferences of fact reasonably and fairly deducible therefrom." *Durante v. Braun*, 263 Md. 685, 689, 284 A. 2d 241 (1971). These facts and inferences must be viewed in the light most favorable to the party against whom the directed verdict is sought, that is, all conflicts must be resolved in his favor, and if "there is any legally relevant and competent evidence from which a rational mind can infer a fact at issue," the motion for a directed verdict must be denied, *Yommer v. McKenzie*, 255 Md. 220, 228, 257 A. 2d 138 (1969). *Accord, Beahm v. Shortall*, 279 Md. 321, 341-343, 368 A. 2d 1005 (1977); *Levine v. Rendler*, 272 Md. 1, 12, 320 A. 2d 258 (1974).

Quality argues that granting the motion for a directed verdict was error for two reasons. *First*, Quality maintains that, viewed in the light most favorable to it, evidence was adduced on the basis of which a jury could have reasonably found a "conscious commitment to a common scheme" in violation of the antitrust laws by Firestone and the Firestone dealers. *Second*, Quality insists that it is not, in any event, necessary to show "a conscious commitment to a common scheme" in order to establish a combination in violation of the antitrust laws, and that sufficient evidence was adduced, under the correct rule of law, to establish a violation.

Firestone, on the other hand, arguing for the legal standard employed by the trial court, insists that "Quality needed to prove that Firestone and its alleged co-conspirators consciously agreed or conspired to fix price and that Firestone terminated Quality pursuant to that conspiracy; it needed to prove a conscious commitment to a common scheme." (Respondent's brief, p. 42.)

In light of the provision of the Maryland Antitrust Act that, in construing this statute, courts be guided (but not bound) by the opinions of the federal courts under the federal antitrust laws, it would be appropriate to briefly review the history of resale price maintenance cases under the Sherman Antitrust Act. In *Dr. Miles Medical Co. v. John D. Park & Sons*, 220 U. S. 373, 31 S. Ct. 376, 55 L. Ed. 502 (1911), Dr. Miles, a drug manufacturer, had attempted to control the prices at which wholesalers and retailers sold its products by means of "consignment contracts" and "retail agency contracts." Although the prices fixed by these contracts were not excessive, the Court held them unenforceable on the ground that they had the effect of forming a combination destructive of competition and hence were agreements in restraint of trade under § 1 of the Sherman Act.[3]

---

3. The Maryland Antitrust Act expressly precludes only "unreasonable" restraints of trade. Although not expressly phrased in this manner, the Sherman Act has long been judicially construed as only precluding contracts or combinations which "unreasonably" restrain competition. *See* Standard Oil Co. of New Jersey v. United States, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed.

This holding was affirmed in *United States v. Schrader's Son, Inc.,* 252 U. S. 85, 99, 40 S. Ct. 251, 64 L. Ed. 471 (1920), where the Court stated that when one "enters into agreements [to fix resale prices]—whether express or implied from a course of dealing or other circumstances," a basis for a Sherman Act violation exists.

However, the antitrust laws prohibit more than those restraints of trade which arise by the agreements of the participants. As the Court stated in *Federal Trade Commission v. Beech-Nut Packing Co.,* 257 U. S. 441, 455, 42 S. Ct. 150, 66 L. Ed. 307 (1922), a resale price maintenance case, the presence vel non of an agreement is not the touchstone of an illegal combination under the antitrust laws:

> "The specific facts found show suppression of the freedom of competition by methods in which the company secures the cooperation of its distributors and customers, *which are quite as effectual as agreements express or implied intended to accomplish the same purpose.*" (Emphasis supplied.)

Recently in *Albrecht v. Herald Company,* 390 U. S. 145, 149, 88 S. Ct. 869, 871, 19 L.Ed.2d 998 (1968), a case involving the termination of a newspaper carrier for failure to observe pricing policies, the Supreme Court reiterated that § 1 of the Sherman Act "covers combinations in addition to contracts and conspiracies, express or implied." *Accord, United States v. Parke, Davis and Company,* 362 U. S. 29, 80 S. Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Bausch & Lomb Optical*

---

619 (1911). However, there are "certain agreements or practices which because of their pernicious effect on competition ... are conclusively presumed to be unreasonable and therefore illegal," Northern Pacific Railway Co. v. United States, 356 U. S. 1, 5, 78 S. Ct. 514, 2 L.Ed.2d 545 (1958). Among the practices deemed *"per se* unreasonable" are price-fixing, division of markets, group boycotts, and tying arrangements, 356 U. S. at 5, and cases there cited. *See also* United States v. Socony-Vacuum Oil Co., 310 U. S. 150, 212-224, 60 S. Ct. 811, 839-844, 84 L. Ed. 1129 (1940). It is settled that resale price maintenance schemes are per se unreasonable. Albrecht v. Herald Company, 390 U. S. 145, 88 S. Ct. 869, 19 L.Ed.2d 998 (1968); United States v. McKesson and Robbins, Inc., 351 U. S. 305, 309-311, 76 S. Ct. 937, 940-941, 100 L. Ed. 1209 (1956).

Co., 321 U. S. 707, 64 S. Ct. 805, 88 L. Ed. 1024 (1944); *Osborn v. Sinclair Refining Company*, 286 F. 2d 832 (4th Cir. 1960), *cert. denied*, 366 U. S. 963, 81 S. Ct. 1924, 6 L.Ed.2d 1255 (1961), 324 F. 2d 566 (4th Cir. 1963).

There is one very limited set of circumstances under which a seller, without violating the Sherman Act, may terminate a dealer for failing to adhere to pricing practices. In *United States v. Colgate & Co.*, 250 U. S. 300, 39 S. Ct. 465, 63 L. Ed. 992 (1919), the Court stated that a seller may announce in advance that he will refuse to deal with any retailers who fail to abide by the seller's announced pricing policies. The Court stated that § 1 of the Sherman Act does not restrict the right of a trader or manufacturer "freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell." (250 U. S. at 307.)

However, in later cases, the Supreme Court has made it clear that the *Colgate* principle is very narrow, *Albrecht v. Herald Company, supra*, 390 U. S. at 148-149; *United States v. Parke, Davis and Company, supra*, 362 U. S. at 36-47; *United States v. Bausch & Lomb Optical Co., supra*, 321 U. S. at 721-723; *Federal Trade Commission v. Beech-Nut Packing Co., supra*, 257 U. S. at 451-455; *United States v. Shrader's Son, Inc., supra*, 252 U. S. at 98-100. In *United States v. Parke, Davis and Company, supra*, involving activity by a drug manufacturer to promote compliance by drugstores with its suggested retail prices, the Supreme Court, after reviewing the resale price maintenance cases subsequent to *Colgate*, stated (362 U. S. at 43):

> "Thus, whatever uncertainty previously existed as to the scope of the Colgate doctrine, Bausch & Lomb and Beech-Nut plainly fashioned its dimensions as meaning no more than that a simple refusal to sell to customers who will not resell at prices suggested by the seller is permissible under the Sherman Act. In other words, an unlawful combination is not just

such as arises from a price maintenance *agreement,* express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy."

The Court in *Parke, Davis* went on to acknowledge that a manufacturer's mere announcement of a resale price policy and simple refusal to sell to those not adhering to that policy, has the same economic effect as conduct proscribed by the Sherman Act, and the Court emphasized that this result would be "tolerated" only in one situation (362 U. S. at 44):

"True, there results the same economic effect as is accomplished by a prohibited combination to suppress price competition if each customer, although induced to do so solely by a manufacturer's announced policy, independently decides to observe specified resale prices. So long as Colgate is not overruled, this result is tolerated but only when it is the consequence of a mere refusal to sell in the exercise of the manufacturer's right 'freely to exercise his own independent discretion as to parties with whom he will deal.' When the manufacturer's actions, as here, go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices, this countervailing consideration is not present and therefore he has put together a combination in violation of the Sherman Act."

The United States Court of Appeals for the Second Circuit, after reviewing *Parke, Davis* and the other Supreme Court cases circumscribing the *Colgate* doctrine, said regarding a seller's "right" to terminate a dealer for refusing to adhere to price maintenance policies *(George W. Warner & Co. v. Black & Decker Mfg. Co.,* 277 F. 2d 787, 790 (2d Cir. 1960)):

"The Supreme Court has left a narrow channel

through which a manufacturer may pass even though the facts would have to be of such Doric simplicity as to be somewhat rare in this day of complex business enterprise."

Consequently, the legal standard argued for by Firestone in the instant case, namely that Quality had to prove that Firestone and co-conspirators "consciously agreed or conspired to fix prices," is not the proper standard to be employed in a case such as this.[4] Instead, in a case involving a seller's termination of a dealer because of the latter's refusal to conform to resale price maintenance policies, a combination in restraint of trade is created where the termination is not the result of the seller's own "independent discretion as to the parties with whom he will deal" or where the seller employs means to effect adherence to resale prices which "go beyond mere announcement of his policy and the simple refusal to deal." *United States v. Parke, Davis and Company, supra,* 362 U. S. at 44.

Turning to the facts of this case, we agree with Quality's contention that evidence was adduced which, viewed in the light most favorable to it, would allow a jury to reasonably conclude that Firestone created a combination in restraint of trade.

Testimony was presented at trial which tended to establish the following facts. Firestone published and distributed to its dealers a suggested list price for its products. According to the testimony of Robert Settle, president of Westminster Tire & Service, Inc., a Firestone dealer, "the tire dealers in the Firestone chain, normally we go by the recommended tire

---

4. In arguing for a "conscious agreement" standard, Firestone relies upon United States v. Standard Oil Company, 316 F. 2d 884 (7th Cir. 1963). However, this was a criminal conspiracy case, involving an alleged horizontal price fixing arrangement among eleven oil companies, who were convicted specifically of having "conspired to raise" retail gasoline prices (316 F. 2d at 887). It was in this context that the court stated that "[t]he substantive law of trade conspiracies requires some consciousness of commitment to a common scheme." (*Id.* at 890.)

prices — the guide which we are sent every month or so." [5] Quality, however, at some point determined that it would be to its advantage to sell Firestone products at prices lower than those of competing dealers. Consistent with this policy, Quality planned to run an independent series of relatively large newspaper advertisements offering Firestone products at discount prices. The first of the proposed large advertisements was shown to Clark Chapman, an official of Firestone, who assisted Quality in preparing the advertisement. According to Chapman, no suggestion was ever made that Quality could not or should not advertise or sell its products at less than Firestone's suggested retail price. Subsequently, the advertisement was published.

On the same day and in the same paper, there appeared a cooperative Firestone advertisement offering to sell Firestone products at prices higher than those contained in Quality's advertisement. Five independent Firestone dealers, along with Quality, participated in this advertisement. Firestone paid for three-quarters of the cost of this advertisement, and it advertised the locations of several Firestone stores (retail outlets owned and operated by Firestone) as well as the locations of independent Firestone dealers. The cooperative Firestone advertisement contained, in addition, the following statement:

> "Priced as shown at Firestone Stores. *Competitively priced at Firestone Dealers* and at all service stations displaying the Firestone sign." (Emphasis supplied.)

Despite the fact that the cooperative advertisement stated that the advertised products were "competitively priced at Firestone dealers," on the day following the appearance of the advertisement, at least three of the five participating

---

5. Proof of parallel business behavior does not, in itself, establish an inference of agreement. Theatre Enterprises v. Paramount Distributing Corp., 346 U. S. 537, 540, 74 S. Ct. 257, 98 L. Ed. 273 (1954). But such evidence, considered in tandem with additional facts, can be sufficient to establish agreement. Pittsburgh Plate Glass Co. v. United States, 260 F. 2d 397 400-401 (4th Cir. 1958), aff'd, 360 U. S. 395, 79 S. Ct. 1237, 3 L.Ed.2d 1323 (1959).

dealers called both Clark Chapman and Thomas Stevens, then a Firestone manager for part of the Baltimore area, complaining about the prices quoted in Quality's independent advertisement. Robert Settle, one of the dealers who called Chapman, in testifying to what he remembered of the conversation, stated that "it just under-priced what the whole Baltimore dealers are running; running slightly under, which I am up in Westminster." Similarly, Raymond Nelson, an employee of another Firestone dealer, Flood Firestone in Annapolis, testified that after a customer had complained to him about Quality's lower price, he called a Firestone representative and said, in effect, "Why would he sell at one price and we have been selling at another price?" Further, there was testimony which indicated that Marvin Schnitzer, a third Firestone dealer who operated three retail stores in the Baltimore area, had spoken to a Firestone representative with the intent of discovering whether "any steps were being taken to assure that this kind of thing didn't happen again," inasmuch as "if this matter were continued to be run, that his business would naturally suffer, because as he pointed out, that naturally the people would go to the place which was running the lowest price."

Clearly, the jury could infer from this testimony that the independent Firestone dealers attached no significance whatsoever to the phrase "competitively priced at Firestone dealers," and that they understood participation in the cooperative advertising to involve an arrangement to sell at the prices there advertised. The immediacy of the complaints, the content of the complaints, and the fact that at least three of the five participating dealers were complainants support this inference.

Chapman testified that when these complaints were communicated to Thomas Stevens, Stevens said, "I will look into it." The same morning, Stevens called Joseph Soley, president of Quality. Mr. Soley reported the conversation as follows:

> "It seemed like all hell broke loose. . . . He felt that we were wrong definitely to advertise even if it was 25 cents below the other dealers. . . . It led to the

fact that *if we didn't change our ways, or conform to what he called a Firestone family . . . that it could result in our cancellation.* . . . He did ask about what we planned to do, and I think I made it clear when I said we are not part of Firestone's family . . . and I said we really want to be independent dealers." (Emphasis supplied.)

In a deposition, introduced into evidence at trial, taken two years prior to the trial, Stevens testified as follows regarding this telephone conversation:

"Q. Who initiated the conversation?
"A. I believe I did. . . .
"Q. How did the conversation begin?
"A. Called Soley and asked him why he would run an ad in conflict in the same newspaper on the same date in a different section of the paper at different prices . . . .
"Q. And what did he reply?
"A. His reply was, well, why, am I upsetting anybody?
"Q. What was your reply to that?
"A. I said it didn't make good business sense to advertise in one portion of the paper, a given tire, and given price, and advertise the same tire at a lower price in a separate section of the paper. . . .
"Q. How did the conversation end?
"A. . . . My conversation ended in that Mr. Soley, I am going to initiate a letter of termination of your dealership agreement with Firestone."

Termination proceedings were subsequently instituted, and Quality was immediately dropped from Firestone's cooperative advertising program.

Thus, viewing the evidence in the light most favorable to Quality, we are faced with the following sequence of events: (1) Firestone, knowing in advance of Quality's intention to

advertise and sell at discount prices, made no objections; (2) Quality advertised Firestone products at prices lower than competing Firestone dealers; (3) these competing dealers immediately complained to Firestone; (4) Firestone, after promising to "look into it," called Quality, threatening to terminate its dealership arrangement unless Quality conformed to existing price levels; (5) Quality refused and was terminated by Firestone. A jury could reasonably infer from these facts the existence of an agreement between Firestone and its independent dealers to maintain resale prices at a given level, and an agreement by Firestone to enforce this pricing policy by taking action against offending dealers.[6] This is sufficient to establish a termination of a dealership in violation of the antitrust laws. As the United States Court of Appeals for the Ninth Circuit stated in a dealer termination case presenting similar evidence, "We would think that a typical case of illegal conspiracy to fix prices would arise from the desire of one dealer to eliminate his price cutting competitor through concerted action with the manufacturer. The simplicity of the case claimed by the appellant is no argument against him." *Girardi v. Gates Rubber Company Sales Division, Inc.,* 325 F. 2d 196, 200 (9th Cir. 1963).

However, even discounting this permissible inference of actual agreement or conspiracy, the evidence is more than adequate to sustain an inference of the existence of an illegal combination under the standards set forth in *United States v. Parke, Davis and Company, supra.* It is clear that the jury

---

6. Because Firestone competes with its independent dealers at the retail level, Quality argues that Firestone is not merely involved in a vertical combination, but in a horizontal combination as well. *See, e.g.,* United States v. McKesson & Robbins, *supra,* 351 U. S. 305. The situation in the instant case would appear to parallel that in Interphoto Corp. v. Minolta Corp., 295 F. Supp. 711, 718 n. 2 (1969), where the court observed that

"... proof of the existence of unlawful resale price maintenance, where the manufacturer is also a distributor — as Minolta is — makes the antitrust violation even more pernicious, see, United States v. McKesson & Robbins, supra, for unlawful cartel activity then co-exists with the attempt to vertically control the discretion of the independent businessman."

could infer that the termination by Firestone of its dealership arrangement was caused by Quality's pricing practices. On the other hand, the testimony suggests that Firestone only took an interest in Quality's pricing practices at the instance of the complaining dealers who were concerned about the effects of price competition. By responding to those dealers as it did, Firestone entered into a combination or arrangement whose purpose was the fixing of prices. *See United States v. General Motors Corp.,* 384 U. S. 127, 86 S. Ct. 1321, 16 L.Ed.2d 415 (1966); *Girardi v. Gates Rubber Company Sales Division, Inc., supra.*

From the evidence that Firestone initially acquiesced in Quality's independent advertisement and that Firestone's later actions were performed at the instance of the complaining dealers, the jury could infer that Firestone's termination of Quality was not "the exercise of a manufacturer's right freely to exercise *his own independent discretion*" in merely announcing *his* policy and refusing to deal with those not adhering, *United States v. Parke, Davis and Company, supra,* 362 U. S. at 44, emphasis supplied. Thus, the "countervailing considerations" which give rise to the *Colgate* exception would here be absent, and Firestone's combination with the independent dealers would be in restraint of trade.

Additional testimony provided a basis on which a jury could find that Firestone, in yet another way, exceeded the limited *Colgate* dispensation. Robert Settle, president of a Firestone dealership, testified:

> "I had my employees, not only myself — we take all different papers home, and we bring in tire ads, and that's how I spotted [Quality's ad] .... I looked at a bunch of tire ads every year and make sure that if there's anything off-beat, under priced, and so forth, we complain to Firestone about it."

A jury could fairly conclude that at least Settle engaged in a kind of policing activity, apprising Firestone of "off-beat and under priced" activities by other dealers. This kind of

activity, coupled with responsive action by Firestone against dealers engaged in "off-beat and under priced" activities, would amount to a combination in violation of the antitrust laws. *See Federal Trade Commission v. Beech-Nut Packing Co., supra,* 257 U. S. 441.

Therefore, viewing the testimony adduced by Quality in the light most favorable to it, we believe that Quality presented a sufficient factual basis for a jury to find that Firestone's termination of Quality was incident to an unlawful combination. A verdict, therefore, should not have been directed in Firestone's favor on this ground.[7]

We do not, of course, express any opinion on the strength or weakness of Quality's case. Other evidence was adduced at trial which, if believed, would have allowed a jury to conclude that Quality's termination was unrelated to its advertisement of Firestone products at lower prices. This, however, is a decision which must be made by the trier of fact. Assuming the truth of the evidence which tends to sustain Quality's case, we hold that this evidence was sufficient for a jury to find that Firestone and its dealers had entered into a combination in restraint of trade in violation of § 11-204 (a) (1) of the Maryland Antitrust Act.

### (2)

### Damages

The trial court, in granting Firestone's motion for a

---

7. It is true that under the contract between Firestone and Quality either party had the right to cancel the contract on 60 days' notice, without cause. This, however, is not relevant to a disposition of these proceedings. As Chief Judge Sobeloff stated for the court in Osborn v. Sinclair Refining Corp., 324 F. 2d 566, 575 n. 17 (4th Cir. 1963):

"Nor would it be a defense to Sinclair that it had a contractual right, under the written lease and written sales agreement, to terminate the relationship on May 31, 1956. A refusal to deal based on a contract provision is, in respect to the antitrust laws, no different from the right of traders generally to select their customers. In either case, the right is limited to situations where the seller has not put together an arrangement in restraint of trade."

directed verdict, stated, without elaboration, that Quality had "not met the burden as to damages."

Quality brought this action pursuant to §§ 11-209 (b) (2) and 11-209 (b) (4) of the Commercial Law Article, which provide that a "person whose business or property has been injured ... by a violation of § 11-204 may maintain an action for damages ... against any person who has committed the violation" for three times the amount of actual damages. The comparable federal provision is 15 U.S.C. 15, which states that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained ...." In construing this statute, the federal courts have consistently held that a plaintiff, in order to maintain a private antitrust action, not only must prove a violation of the antitrust laws by the defendant, but, also with regard to damages, must prove: (1) that he has in fact suffered an injury; (2) that the injury resulted from the violation of the antitrust laws; and (3) the amount in which he has been injured. *See, e.g., Terrell v. Household Goods Carriers' Bureau,* 494 F. 2d 16, 20 (5th Cir. 1974), *cert. dismissed,* 419 U. S. 987, 95 S. Ct. 246, 42 L.Ed.2d 260 (1974), and cases there cited.

A plaintiff is required to prove the fact of at least some injury with reasonable certainty. *Rea v. Ford Motor Co.,* 497 F. 2d 577, 589 (3d Cir. 1974), *cert. denied,* 419 U. S. 868, 95 S. Ct. 126, 42 L.Ed.2d 106 (1974). The courts have recognized, however, that the measurement of damages in antitrust cases is an intrinsically uncertain enterprise. *Flintkote Company v. Lysfjord,* 246 F. 2d 368, 391 (9th Cir. 1957), *cert. denied,* 355 U. S. 835, 78 S. Ct. 54, 2 L.Ed.2d 46 (1957). Consequently, when a plaintiff has proved with reasonable certainty *the fact that he has been damaged in some degree,* the courts have adopted more relaxed standards of proof with regard to the proof of *the amount of damages* which were sustained. As was stated in *Story Parchment Co. v. Patterson Parchment*

*Paper Co.,* 282 U. S. 555, 562, 51 S. Ct. 248, 75 L. Ed. 544 (1931):

> "It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount."

*See also Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U. S. 359, 376-379, 47 S. Ct. 400, 71 L. Ed. 684 (1927); *Washington State Bowling Proprietors Ass'n v. Pacific Lanes, Inc.,* 356 F. 2d 371, 379 (9th Cir. 1966), *cert. denied,* 384 U. S. 963, 86 S. Ct. 1590, 16 L.Ed.2d 674 (1966).

Thus, in *Bigelow v. RKO Radio Pictures,* 327 U. S. 251, 264, 66 S. Ct. 574, 90 L. Ed. 652 (1946), it was held that, although a jury's verdict on damages may not be based on "speculation and guesswork,"

> "the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. . . . '[J]uries are allowed to act on probable and inferential, as well as [upon] direct and positive proof.' . . . Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim."

Similar considerations to those mentioned above have led the courts to adopt equally relaxed standards of proof with regard to the element of causation of damages. In *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U. S. 690, 697, 82 S. Ct. 1404, 8 L.Ed.2d 777 (1962), the Court observed that

> " 'where the plaintiff proves a loss, and a violation by defendant of the antitrust laws of such a nature as to be likely to cause that type of loss . . . the jury, as the trier of the facts, must be permitted to draw

from this circumstantial evidence the inference that the necessary causal relation exists.' "

Applying these principles to the instant case, Quality needed to adduce evidence which would allow the jury, with reasonable certainty, to conclude that it had been damaged. This established, Quality would be then only required to show that the violation by Firestone was of such a nature as to be likely to cause such a loss, and to provide a basis of relevant data upon which the jury might make a just and reasonable *estimate* of the amount of damage suffered. But while mathematical precision is in no way required, the jury must not be forced into pure speculation and guesswork.

Quality argues that the evidence produced at trial, viewed in the light most favorable to it, was sufficient to support an award of damages with respect to three items: (1) damages resulting from loss of sales because of less adequate advertising; (2) damages resulting from increased costs of independent advertising; and (3) damages resulting from increased costs of purchasing tires from sources other than the manufacturer.

With regard to the first item, damages due to lost sales because of less adequate advertising, Quality adduced testimony from John Frank, the general manager of Quality at the time of termination, to the effect that after Quality was omitted from the cooperative advertising, during the height of the spring tire season, the number of customers who came to Quality requesting Firestone brand tires dropped by some fifty percent. This testimony regarding decrease in traffic was corroborated by Joseph Soley, president of Quality. Firestone, however, emphasizes the following exchange:

> "COUNSEL: [Didn't] sales for Firestone brand tires [increase] after April 4th [the date of the exclusion of Quality from the cooperative advertising]?
>
> "MR. FRANK: [Yes, but that] doesn't include the promotion we did internally, and the sales promotion — advertising we did on our own. That is stipulated

Firestone's sales. Now, this is opposed to the cooperative advertising of Firestone. What I am saying is that through Firestone's advertising, when they ceased, we ceased to be part of their cooperative advertising, yes, I did notice a dramatic decrease in our Firestone sales or requests for sales, but the fact that the chart might show that there was an increase in sales would have to relate — we internally promoted and we internally advertised and promoted Firestone products on our own.

"Q. So is it fair to say that you suffered a loss of traffic because of the cooperative advertising, but you made up for that with your own advertising?

"A. Yes, we did."

Firestone maintains that this evidence established only a decline in requests for Firestone brand tires, that Quality compensated for this decline in traffic with its own promotion, and that there was no corresponding decline in its sales of Firestone brand tires. On the basis of this testimony, Firestone argues that Quality has failed to meet its burden of proving with reasonable certainty the *fact* that it was damaged by lost sales because of less adequate advertising.

With regard to the second item, damages resulting from increased costs of independent advertising, Quality adduced testimony to the effect that the low-priced cooperative advertising sponsored by Firestone was advantageous to it, and that it was necessary to replace it with more expensive independent advertising. With regard to the amount of damage, Quality introduced copies of newspaper invoices reflecting an increase in the cost, size and expense of Quality's independent advertising after its exclusion from the cooperative advertising. These showed that expenditures rose from $5,174.00 in 1973 to $34,310.00 in 1974 and $38,436.00 in 1975. Testimony further showed approximately the portion of the advertisements which were attributable to the Quality location, and that the majority of advertisements were either placed under the Firestone emblem or advertised Firestone

products.[8] Firestone does not seriously dispute that the evidence of Quality's omission from the cooperative advertising was reasonably certain proof that Quality sustained at least some damage.[9] Firestone paid at least three-quarters of the cost of these advertisements, and a jury could fairly infer that it would cost Quality more to achieve the same impact with independent advertising. Firestone does argue, however, that since no proof was offered by Quality to show what portion of the increased cost of advertising was necessary to achieve an impact equal to that generated by the cooperative advertising, Quality had left the jury to speculate as to the amount of increased expenditures and consequently failed to provide a basis on which the jury could "reasonably estimate" the amount of damages.

Assuming that these contentions by Firestone concerning the first two items of asserted damages are correct, we nonetheless are of the opinion that the trial court erred in granting Firestone's motion for a directed verdict. It is clear that Quality adduced evidence which, if believed, was sufficient for a jury to find both the fact and the amount of damages with regard to the third item, namely damages resulting from increased costs of purchasing tires from sources other than the manufacturer.

Evidence was introduced at trial to the effect that, after its termination by Firestone, Quality was no longer able to purchase Firestone products at dealer prices. In order to maintain its line of Firestone brand tires, Quality was forced to make purchases from independent wholesalers at less favorable prices. Quality introduced at trial a number of invoices reflecting the purchase, by Quality, of Firestone tires from independent wholesalers after the termination by

---

8. Sometime after its termination, Quality opened a business at a new location under the name of "Skip's Tires." Some of the increased advertising expenditures were attributable to Skip's Tires.

9. There was testimony at trial that Quality, if it had not been terminated, for a fee of $125 per month would have been able to participate in sixteen to twenty Firestone cooperative advertisements each month, the size of the advertisements usually being approximately two feet by six inches.

Firestone. These invoices specified both the quantity and the purchase price of the tires. Testimony by Mr. Soley, based on his experience as a tire dealer and his continued access to Firestone price lists, established, within five or six percent, the prices which would have been charged to a Firestone dealer for these same purchases at comparable times.

Thus, Quality adduced testimony which, if believed, would allow the jury to find that Quality incurred actual increased expenditures, in the form of higher prices paid for tires, as a result of its termination by Firestone. It is well settled that the extra cost of obtaining goods elsewhere as a consequence of an unlawful refusal to deal is a recoverable item of damage. *Flintkote Company v. Lysfjord, supra,* 246 F. 2d at 389-390; *Straus v. Victor Talking Mach. Co.,* 297 F. 791 (2d Cir. 1924); *Lowry v. Tile, Mantel & Grate Ass'n,* 106 F. 38, 47 (Cir. Ct. N.D. Cal.), *aff'd,* 115 F. 27 (9th Cir. 1902), *aff'd,* 193 U. S. 38, 24 S. Ct. 307, 48 L. Ed. 608 (1904). Furthermore, this evidence would have allowed the jury to estimate, within five to six percent, the amount of additional expense which Quality incurred as a result of its inability to obtain tires from Firestone at dealer prices. This is a more than adequate basis upon which the jury could have estimated one of the items of damage done to Quality by the illegal termination of its dealership.[10]

---

10. Firestone, in arguing that Quality has failed to meet its burden of proof with respect to the fact of damages, relies on Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc., 459 F. 2d 138, 148 (6th Cir. 1972), where the court stated:

"An essential element in attempting to establish the fact of damage because of exclusion from a specified source of supply is the lack of an alternative comparable substitute for the desired merchandise."

Since Quality had made no attempt to show that it had no alternative comparable substitute for Firestone tires — *i.e.,* other brands of comparable tires at comparable prices — Firestone argues that Quality has not proven the fact of any damage. We disagree. *Elder-Beerman* was a private antitrust action in which the plaintiff claimed that he had been unable to obtain certain brands of merchandise due to an illegal exclusive dealings arrangement. Apparently, the plaintiff had never carried the brand items in question. The plaintiff then maintained that he had lost *sales,* and consequently profit, because he had not been able to obtain these brands. The court appeared to suggest that the plaintiff, in order to show the fact of lost sales due to his exclusion from a source of supply, must prove that no comparable brands were available from other sources of supply. However valid it may be to impose

On this ground also, therefore, the trial court was in error in directing a verdict in favor of Firestone.

### (3)

### *Pre-Trial Orders*

Finally, Quality takes exception to three orders issued by the court prior to trial.[11]

(a) *Order of June 20, 1975.* On this date, the trial court denied Quality's motion to amend its declaration a second time. It is, of course, well settled that amendments should be freely allowed to serve the ends of justice. *Dart Drug v. Hechinger Co.,* 272 Md. 15, 320 A. 2d 266 (1974). In particular, given the typically extensive discovery in antitrust cases, it will often be appropriate for amendments to be allowed long after the filing of the initial pleading. *Castlegate, Inc. v. National Tea Co.,* 34 F.R.D. 221 (D. Colo. 1963).

In the instant case, no reason was given for the trial court's denial of leave to amend. However, at the time Quality filed its motion, trial was scheduled to commence within three weeks, and we assume this to be the basis of the trial court's ruling. Since Quality will have adequate opportunity on remand to file a timely amendment to its declaration before the new trial commences, we need not determine whether the trial court abused its discretion in denying Quality leave to amend.

(b) *Order of December 7, 1976.* On this date, the trial court denied Quality's motion to compel answers to the following interrogatory directed to Firestone:

"List all the legal actions instituted or threatened

---

the proof of this negative upon a plaintiff in an action for damages from lost sales in these circumstances, this theory has no application to the instant case, where the item of damage claimed is the *actual* increased expense of doing business, and where the plaintiff had established himself as a seller of Firestone brand products.

11. Quality also alleges that a motion to compel deposition answers was wrongly denied. In our examination of the record, we find that the motions of all parties regarding discovery, including Quality's motion to compel deposition answers, were denied on June 20, 1975, due to improper form. Quality subsequently refiled its motion in proper form, but we find no indication in the record that any formal action was ever taken on this motion.

against Firestone by former or present dealers of Firestone since January 1, 1970 . . . ."

The trial court concluded that "the Interrogatories as stated are too broad." We agree.

An interrogatory framed by Quality which limited its focus to *antitrust* actions in which Firestone was involved might have been appropriate. As was stated in *Southside Drive-In Company v. Warner Bros. Distributing Corp.*, 30 F.R.D. 32, 35 (E.D. Pa. 1962):

> "Defendants argue that the only parts of their actions which are relevant are those which are directed at plaintiff. Obviously defendants' actions vis-a-vis plaintiff are of immediate concern, but such actions will have to be evaluated and that cannot be done in a vacuum. Defendants' actions will have to be characterized, at some stage of the proceedings, either as a reasonable business practice or conspiratorial discrimination, and such characterization would be impossible under the narrow context urged by defendants."

Here, however, Quality's interrogatory concerned *all legal actions* in which Firestone was involved, thus including, for example, ordinary tort claims, breach of warranty actions, and suits to recover indebtedness, which matters are irrelevant to this case.

(c) *Order of January 24, 1977.* Quality finally objects to an order in limine, restricting Quality from introducing proof of certain issues. However, the order limited Quality to proof of the issues as framed in its declaration and was, therefore, entirely proper.

> *Judgment reversed and case remanded to the Circuit Court for Baltimore County for further proceedings not inconsistent with this opinion.*
> *Respondent to pay costs.*