485 A.2d 663

NATURAL DESIGN, INC., et al.

v.

The ROUSE COMPANY et al.

No. 58, Sept. Term, 1983.

Court of Appeals of Maryland.

Dec. 28, 1984.

48

50

Jack J. Shapiro, Baltimore (William J. Pittler, Baltimore, on brief), for appellants.

Lewis A. Noonberg, Baltimore (John E. Griffith, Jr. and Piper & Marbury, Baltimore, on brief), Robert R. Bowie, Jr., Towson (White, Mindel, Clarke & Hill, Towson, on brief), for appellees.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE,* DAVIDSON, RODOWSKY and COUCH, JJ.

ELDRIDGE, Judge.

The plaintiffs here challenge the granting of the defendants' motions for summary judgment in an action under the Maryland Antitrust Act, Maryland Code (1975, 1983 Repl. Vol.), §§ 11–201 through 11–213 of the Commercial Law Article. The plaintiffs are Natural Design, Inc. (trading as Baycraft), The Raintree Company, and the officers of both corporations. The defendants include the Village of Cross Keys, Inc., which operates a shopping center called "The Village Square," the Rouse Company, which owns the Village of Cross Keys, Inc.,[1] and The Store, Ltd., which rents retail space at The Village Square. Various officers and representatives of Rouse and the owners of The Store, Ltd., are also defendants.

The Store, Ltd., opened at The Village Square in 1965. In February 1973, Rouse and Natural Design, Inc., signed a lease for commercial space at The Village Square for a store to be known as Baycraft. The lease was to expire on May 31, 1979. In 1974, the owners of Baycraft decided to open a store to sell bath related items at The Village Square. Rouse and the Baycraft owners entered a lease for this second store, The Raintree Company, in August 1974. In December 1979, after two brief extensions of the Baycraft lease, Rouse informed the owners that the lease would not be renewed. In April 1980, Raintree received a letter from David L. Moeslein, administrative assistant to the manager of The Village of Cross Keys, informing it that

---

* Davidson, J., participated in the hearing and in the conference of the case in regard to its decision, but died prior to the adoption of the opinion by the Court.

1. As the Village of Cross Keys, Inc., is a wholly owned subsidiary of the Rouse Company, and as the parties to this litigation have generally not distinguished between the two, we shall in this opinion use the term "Rouse" to refer to both the Village of Cross Keys, Inc., and the Rouse Company.

Rouse would not renew Raintree's lease at The Village Square.

The plaintiffs filed this action in the Superior Court of Baltimore City (now part of the Circuit Court for Baltimore City) in November 1980. The plaintiffs charged that, while Baycraft operated at The Village Square, Rouse conspired with The Store, Ltd., to restrain trade at the shopping center by pressuring Baycraft not to compete with The Store, Ltd., and that, in furtherance of this conspiracy, Rouse refused to renew Baycraft's lease. These acts, the plaintiffs contended, violated § 11–204(a)(1) of the Maryland Antitrust Act, which provides that "[a] person may not ... [b]y contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce ...." The plaintiffs also alleged that Rouse refused to renew both Baycraft's and Raintree's leases in an effort to monopolize trade at The Village Square, in violation of § 11–204(a)(2) of the Act, which provides that "[a] person may not ... [m]onopolize, [or] attempt to monopolize ... any part of the trade or commerce within the State, for the purpose of excluding competition or of controlling, fixing or maintaining prices in trade or commerce." In addition to the antitrust counts, the plaintiffs maintained that the acts of the defendants constituted the tort of malicious interference with the plaintiffs' business.[2] The plaintiffs sought treble damages and attorney's fees as provided in § 11–209(b)(4) of the Commercial Law Article for the anti-trust violations, and compensatory and punitive damages for the alleged malicious interference with their business.

After extensive discovery, the trial court granted the defendants' motions for summary judgment on all counts. The plaintiffs took an appeal to the Court of Special Ap-

---

**2.** Although all defendants were originally included in the malicious interference count, the plaintiffs on appeal direct the malicious interference argument only to the defendants The Store, Ltd., and its owners.

peals, and this Court issued a writ of certiorari before any proceedings in the intermediate appellate court.

On appeal, the plaintiffs contend that disputes as to material facts exist on all issues and that, therefore, the trial court improperly granted the defendants' motions for summary judgment. For the reasons stated below, we hold that summary judgment should not have been granted on the restraint of trade and malicious interference counts but that the defendants were entitled to summary judgment on the monopoly allegations.

## I. Restraint of Trade

The purpose of the Maryland Antitrust Act is "to complement the body of the federal law governing restraints of trade." § 11–202(a). That section goes on to state that, in construing the Act, "the courts [are to] be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters." Section 11–204(a)(1) of the Maryland Act is essentially the same as § 1 of the Sherman Antitrust Act of July 2, 1890, 26 Stat. 209, as amended, 15 U.S.C. § 1. Thus, decisions of the federal courts interpreting § 1 of the Sherman Act guide us here. *See State v. Jonathan Logan Inc.*, 301 Md. 63, 66–68, 482 A.2d 1 (1984); *Quality Disc. Tires v. Firestone Tire*, 282 Md. 7, 11, 382 A.2d 867 (1978).

The plaintiffs maintain that legitimate price competition existed at The Village Square between Baycraft and The Store, Ltd., from 1973 to 1975. The plaintiffs claim that, after Rouse began receiving complaints from The Store, Ltd., about Baycraft's price competition and other competitive practices, Rouse commenced pressuring Baycraft to become less competitive with The Store, Ltd. Rouse allegedly insisted that Baycraft stop selling at lower prices the same goods as The Store, Ltd., sold and that Baycraft stop price promoting at The Village Square. The plaintiffs maintain that Rouse also insisted that Baycraft not deal with certain manufacturers with whom The Store, Ltd., dealt and that Baycraft stop offering less expensive limita-

tions of goods which The Store, Ltd., sold. According to the plaintiffs, Rouse threatened that, if Baycraft did not accede to these demands, its lease would not be renewed when it expired in 1979. The plaintiffs further maintain that Rouse's actions were taken in concert with the other defendants, particularly the owners of The Store, Ltd. The plaintiffs also charge that Baycraft's lease at The Village Square was not renewed as a result of this concert of action.

The defendants respond that all of the actions which they took were reasonable under the circumstances and were, therefore, not prohibited by the Maryland Antitrust Act. They further maintain that Rouse's actions were taken independently of the other defendants for the purpose of enforcing the "use" clause in Baycraft's lease.[3] The defendants argue that, even conceding some evidence of price-fixing, such evidence was insufficient to establish a "contract, combination, or conspiracy" to fix prices.

(a)

In considering the defendants' argument that their alleged actions were "reasonable," a brief review of the applicable law is in order.

As interpreted by the Supreme Court, § 1 of the Sherman Act renders unlawful only those restraints of trade which are unreasonable. *Standard Oil Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911). The Maryland Antitrust Act specifically limits its prohibition to unreasonable restraints of trade or commerce. § 11–204(a)(1). Determining whether a particular practice

---

3. Baycraft's lease stipulated that the premises could be used for "[t]he sale, at retail of: natural and nautical wood furniture (design furniture are unique pieces of furniture made from the wood and hatch covers of antique World War I and II ships and woods used to create that effect), household appointments, wooden kitchen and serving accessories, handcrafted pottery, fur rugs, crystal and handblown glass; provided, however, tenants shall use no more than 15% of the floor area of the Premises for the display and sale of handcrafted pottery, fur rugs, crystal and handblown glass."

constitutes an unreasonable restraint of trade ordinarily requires a weighing of all "the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). This requirement, known as the "rule of reason," was further described by the Supreme Court as follows (*Continental T.V., Inc. v. GTE Sylvania, Inc., supra,* 433 U.S. at 49 n. 15, 97 S.Ct. at 2557 n. 15, quoting from *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918)):

> "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

The rule of reason, however, is inapplicable to certain practices which are deemed to be unreasonable *per se.* As explained in *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958):

> "However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of

restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken."

As indicated above, if an antitrust plaintiff can establish that a challenged practice is *per se* unreasonable, he lightens considerably his burden of proof. Examples of practices which have been held to be *per se* unreasonable are price fixing, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), including resale price maintenance, *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); group boycotts, *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); some tying arrangements, *Northern Pacific Railway Co. v. United States, supra; International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); and "horizontal" divisions of markets, *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).[4]

The defendants, while conceding at the oral argument before us that there was in this case some evidence of restraint of trade, including evidence of price-fixing,[5] primarily contended at oral argument that such evidence should be analyzed under the rule of reason and not under

---

**4.** "Horizontal" restraints are agreements between competitors at the same level of the market structure made to minimize competition. "Vertical" restraints, on the other hand, involve agreements between persons at different levels of the market structure, such as manufacturers and distributors. *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).

**5.** Counsel for the defendants, however, stated that such evidence of price-fixing amounted to "only a scintilla."

the *per se* standard. Drawing an analogy between the landlord Rouse and a manufacturer selling products to retailers, and between the tenant Baycraft and a retail dealer in those products,[6] the defendants maintained that vertical restrictions imposed upon the dealer, including price restrictions, should be judged by the rule of reason standard.[7] The defendants' reliance at oral argument was upon *Continental T.V., Inc. v. GTE Sylvania, Inc., supra,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568, and upon an argument made in a case then pending in the Supreme Court, but now decided, *Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

Prior to *Continental T.V., Inc. v. GTE Sylvania, Inc., supra,* the Supreme Court had held in *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), that a manufacturer's restrictions on geographical areas in which a distributor was permitted to trade in an article after the manufacturer had sold it to him was a *per se* violation of § 1 of the Sherman Act. In *Continental T.V., Inc. v. GTE Sylvania, Inc.,* the Supreme Court reexamined its *Schwinn* holding. Sylvania, a television manufacturer, limited the number of franchises it granted to retailers in any given area and retained sole discretion to increase the number in any area. The Supreme Court determined that *Schwinn* would require that a *per se* rule be applied to this practice. The Court observed, however, that although the vertical restriction in *Sylvania* reduced competition between Sylvania dealers (intraband

---

**6.** As the defendants have drawn this analogy, we shall, solely for purposes of this appeal, deal with the case in the same framework. *Cf. Harold Friedman Inc. v. Thorofare Markets,* 587 F.2d 127, 142 (3d Cir.1978) (exclusivity clause in shopping center lease is analogous to exclusive dealing arrangements between manufacturers and distributors).

**7.** An unstated assumption of this contention is that, if judged by the rule of reason, there was no triable issue in this case concerning the reasonableness of any restraint of trade and that summary judgment was therefore appropriate. In light of our conclusion in this opinion, it is unnecessary for us to explore the assumption at the present time.

competition), it fostered competition between Sylvania and makers of other television brands (interbrand competition). The Court, overruling *Schwinn,* concluded

> "that the appropriate decision is to return to the rule of reason that governed vertical restrictions prior to *Schwinn.* When anti-competitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason, the standard traditionally applied for the majority of anticompetitive practices challenged under § 1 of the Act." 433 U.S. at 59, 97 S.Ct. at 2562.

The Supreme Court in *Sylvania,* however, pointed out that its decision was limited to *nonprice* vertical restrictions. The Court stated ( *id.* at 51 n. 18, 97 S.Ct. at 2558 n. 18):

> "As in *Schwinn,* we are concerned here only with nonprice vertical restrictions. The *per se* illegality of price restrictions has been established firmly for many years and involves significantly different questions of analysis and policy. As Mr. Justice White notes, *post,* at 68–70 [97 S.Ct. at 2568], some commentators have argued that the manufacturer's motivation for imposing vertical price restrictions may be the same as for nonprice restrictions. There are, however, significant differences that could easily justify different treatment. In his concurring opinion in *White Motor Co. v. United States,* Mr. Justice Brennan noted that, unlike nonprice restrictions, "[r]esale price maintenance is not only designed to, but almost invariably does in fact, reduce price competition not only *among* sellers of the affected product, but quite as much *between* that product and competing brands." 372 U.S. [253], at 268 [83 S.Ct. 696, 9 L.Ed.2d 738 (1963) ]...."

The defendants, while acknowledging in oral argument that the *Sylvania* holding did not extend to vertical price restrictions, nevertheless argued that the Supreme Court would be reexamining the appropriateness of applying a *per se* rule to vertical price-fixing agreements in a case then pending before it, *Monsanto Co. v. Spray-Rite Service*

*Corp.*, 684 F.2d 1226 (7th Cir.1982), *cert. granted*, 460 U.S. 1010, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983). As previously mentioned, the Court has since decided that case, *Monsanto Co. v. Spray-Rite Service Corp., supra,* —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775.

*Monsanto* involved allegations of a conspiracy by a manufacturer and some of its distributors to fix resale prices. In *Monsanto*, the Solicitor General in an amicus brief argued that the economic effect of resale price maintenance is not much different from that of nonprice restrictions such as involved in the *Sylvania* case. The Solicitor General suggested that the Court take the opportunity to reexamine the application of a *per se* rule to vertical price-fixing agreements. The Court declined to reach the question, commenting (—— U.S. at —— – —— n. 7, 104 S.Ct. at 1469–1470 n. 7):

> "Certainly in this case we have no occasion to consider the merits of this argument. This case was tried on *per se* instructions to the jury. Neither party argued in the District Court that the rule of reason should apply to a vertical price-fixing conspiracy, nor raised the point on appeal. In fact, neither party before this Court presses the argument advanced by amici. We therefore decline to reach the question, and we decide the case in the context in which it was decided below and argued here."

Thus, the *per se* rule as applied to vertical price-fixing agreements still retains its vitality. The *per se* rule is applicable to the case at bar to the extent that the facts show a price-fixing arrangement.[8]

---

**8.** Alternatively, in arguing for the application of a *per se* rule here, the plaintiffs maintain that this case is one of a horizontal restraint of trade. The plaintiffs point to horizontal competition between Baycraft and The Store, Ltd., and charge that Rouse imposed the restraints to benefit The Store, Ltd., by eliminating direct competition from Baycraft. Courts and commentators have expressed the view that dealer terminations made in response to requests from a competing dealer or dealers, although vertical in form, have horizontal effects on the market and may call for *per se* analysis. *See generally,* Piraino, *Distributor Terminations Pursuant to Conspiracies Among a Supplier and Complaining Distributors: A Suggested Antitrust Analysis,*

(b)

We turn next to the defendants' contention that there was insufficient evidence of a "contract, combination, or conspiracy" to fix prices at The Village Square and that the evidence requires the conclusion, as a matter of law, that Rouse acted unilaterally.

Section 1 of the Sherman Act does not reach entirely unilateral conduct. *Copperweld Corp. v. Independence Tube Corp.,* —— U.S. ——, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984), and cases there cited. A refusal to deal with a retailer, who will not adhere to certain pricing policies, is not prohibited by § 1 if it is done unilaterally. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 922 (1919); *Quality Disc. Tires v. Firestone Tire, supra,* 282 Md. at 14, 382 A.2d 867. In *Quality Disc. Tires* we discussed the *Colgate* case as follows (282 Md. at 14, 382 A.2d 867):

"In *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), the Court stated that a seller may announce in advance that he will refuse to deal with any retailers who fail to abide by the seller's announced pricing policies. The Court stated that § 1 of the Sherman Act does not restrict the right of a trader or manu-

---

67 Cornell L.Rev. 297 (1982); Comment, *Vertical Agreement as Horizontal Restraint: Cernuto, Inc. v. United Cabinet Corp.,* 128 U.Pa.L.Rev. 622 (1980); *see also,* Comment, *Vertical Agreements to Terminate Competing Distributors: Oreck Corp. v. Whirlpool Corp.,* 92 Harv.L.Rev. 1160 (1979). It would seem to us, however, at least at this stage, that the instant case involves essentially vertical restrictions. Therefore, to the extent that Rouse imposed or attempted to impose restrictions upon Baycraft unrelated to pricing, such as limitations upon the type of merchandise sold irrespective of the selling price, it would appear that such restrictions should be judged by the rule of reason in light of the *Sylvania* case. Nevertheless, because in our view there was enough evidence suggesting a price-fixing arrangement to defeat the summary judgment motion on the restraint of trade count, we need not at this time address the plaintiffs' argument further. Our opinion in this case does not preclude the plaintiffs at trial from attempting to prove the existence of an essentially horizontal restraint of trade.

facturer 'freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.' (250 U.S. at 307 [39 S.Ct. at 468].)"

The limited scope of the *Colgate* doctrine, however, was emphasized in later cases, such as *United States v. Parke, Davis and Company*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). In *Parke, Davis* the Court held (362 U.S. at 44, 80 S.Ct. at 511):

"When the manufacturer's actions ... go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices ... he has put together a combination in violation of the Sherman Act."

*See Quality Disc. Tires v. Firestone Tire, supra*, 282 Md. at 14–16, 382 A.2d 867, and cases there cited.

The defendants in the present case contend that the plaintiffs must establish more than Rouse's receiving complaints followed by Rouse's pressure on Baycraft and ultimate termination of Baycraft's lease. Otherwise, according to the defendants, there would be nothing to negate the inference that Rouse acted unilaterally and thus within the narrow confines of *Colgate*.

Recently, in *Monsanto Co. v. Spray-Rite Service Corp.*, *supra*, the Supreme Court addressed the quantum of proof necessary to establish a price-fixing contract, combination, or conspiracy when a manufacturer terminates a distributor or dealer after receiving complaints from another distributor or dealer. In that case, the plaintiff, a terminated distributor of agricultural herbicides, alleged that he had been terminated because of complaints from other distributors that he had been price-cutting. The Court described the evidence needed to establish a § 1 contract, combination, or conspiracy in this situation as follows: "Thus, something more than evidence of complaints is needed. There must be evidence that tends to exclude the possibility that the manufacturer and non-terminated distributors were

acting independently." 104 S.Ct. at 1471. The Supreme Court indicated that a price-fixing combination or agreement could be inferred from circumstantial evidence as well as direct evidence, *id.* at 1471–1472 n. 10, as long as the "inference of such an agreement [is not] drawn from highly ambiguous evidence," *id.* at 1470.[9]

■ We now turn to the evidence, consisting of testimony and documents produced through discovery, tending to show that the defendants had formed a contract, combination or conspiracy to restrict Baycraft's pricing practices. As the defendants were the moving party in seeking summary judgment, this evidence, including all inferences therefrom, has been viewed by us in a light most favorable to the plaintiffs. *See, e.g., Doe v. Bd. of Educ., Montgomery Co.,* 295 Md. 67, 70, 453 A.2d 814 (1982); *Coffey v. Derby Steel Co.,* 291 Md. 241, 246, 434 A.2d 564 (1981); *Peck v. Baltimore County,* 286 Md. 368, 381, 410 A.2d 7 (1979); *Lawless, Adm'x v. Merrick,* 227 Md. 65, 70, 175 A.2d 27 (1961).

In 1975, the owners of the The Store, Ltd., became concerned with what they saw as changes in the character of the Baycraft operation. In their view, Baycraft had

---

**9.** In *Monsanto,* the Court also described the type of evidence necessary to exclude the possibility of independent action as "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." 104 S.Ct. at 1473. In *Quality Disc. Tires v. Firestone Tire, supra,* decided before *Monsanto,* this Court had indicated that, in a case involving a dealer termination because of pricing practices and complaints from competing dealers, it was not necessary under *United States v. Parke, Davis and Company, supra,* 362 U.S. at 44, 80 S.Ct. at 511, that the plaintiff prove that the seller and other dealers "consciously agreed or conspired to fix prices" as long as the action was not unilateral. 282 Md. at 16, 382 A.2d 867. Nevertheless, the type of evidence the Supreme Court called for in *Monsanto* to establish that a manufacturer did not act independently in terminating a distributor after receiving complaints from a competing distributor was present in *Quality,* 282 Md. at 20, 382 A.2d 867. However, to the extent that there may be any inconsistency between the language in *Quality* and the standard set forth in *Monsanto* with regard to this issue, the *Monsanto* case should control in light of § 11–202(a)(2) of the Maryland Antitrust Act.

begun to become more "gift oriented." The owners were concerned with Baycraft's copying The Store, Ltd.'s operation, and doing so at lower prices. On June 17, 1975, they sent a letter to the manager of The Village of Cross Keys which contained, *inter alia*, the following:

"One of the original precepts of The Village Square was minimal duplication among entrepreneurs and, while there were small areas of overlapping, for the most part there were no great incursions until relatively recently.

\* \* \* \* \* \*

"In the past year, however, there have been some radical changes in the look, style and buying sources of Baycraft Ltd. The overwhelming influence seems to have been The Store Ltd. (To some extent there has been some copying of Jones & Jones). Not only has Baycraft Ltd copied our general lines, but has had the temerity to stock identical items, *often at lower prices*. Their displays are a shameful attempt to copy the style of The Store Ltd. but they fall short and insult the taste level striven for by most of the other Cross Keys business people.

\* \* \* \* \* \*

"We can cite, chapter and verse, a saga of practices that are unnecessary direct assaults on what we consider our provinces of merchandising. They mimic in several ways: 1) stock identical items; 2) stock copies of the originals we handle; 3) *stock inferior but competitive lines at lower prices*. These practices are destructive of the very fibre of the original dream of The Village of Cross Keys.

\* \* \* \* \* \*

"The attached list will give specific examples of lines copied and occasionally displayed in their show windows. Most of the items on this list represent a substantial investment on our part.

"We ask that Baycraft Ltd be confronted immediately and made to cease and desist ...." (Emphasis added.)

The plaintiffs produced a June 19, 1975, memorandum, from Rouse's director of merchandising, Edwin Daniels. In

the memorandum, Daniels discussed the change in the Baycraft operation and commented: "I must also add that Baycraft's copying of lines, display techniques and *price-cutting* are a very sore point with other merchants who have pioneered with us the whole concept of the Village." (Emphasis added.)

That same month, Larry Wolf, Rouse's director of retail leasing, held a meeting at the delicatessen of The Village Square with the owners of Baycraft to discuss The Store, Ltd.'s concerns. According to one of Baycraft's owners, Martin Sitnick, Wolf told him that the meeting was being held because of complaints Wolf had received from The Store, Ltd., and others. At the meeting, the Baycraft owners allegedly were told to stop promoting merchandise at Cross Keys and to stop buying copies of merchandise sold by The Store, Ltd., and selling them at reduced prices. Wolf gave Martin Sitnick a list of particular merchandise he was not to sell and certain importers and manufacturers from which he was not to buy. Sitnick recalled being told that "Cross Keys was not the place for that kind of competition" and that if Baycraft did not stop cutting prices, its lease would not be renewed.

At the meeting, Sitnick also expressed his concern because, shortly after the meeting began, one of the owners of The Store, Ltd., came to the delicatessen and sat at a table close to where the Baycraft owners and the Rouse representatives were sitting and remained there through the entire meeting. Sitnick stated:

"I felt like I was being put in the position of being reprimanded for his benefit.

\*　　\*　　\*　　\*　　\*　　\*

"It was obvious he was sitting there listening to what was being said, and it seemed to me that it was strange that the meeting had been moved there so that it became almost a public forum if someone wanted to sit there and listen, and coincidentally he just happened to walk in

when the meeting started and sat there throughout the meeting.

\* \* \* \* \* \*

"It was obvious if he came in in the very beginning and sipped coffee, which if you spent seven years there you would know that he never did, or very rarely. It was obvious what was going on."

Wolf summarized the meeting in a June 27, 1975, letter to Sitnick, in which he wrote, in part:

"I—like you—would eventually like to see sales of $300,000. I would not, however, like to see it accomplished at the cost of anyone else's business in VCK [The Village of Cross Keys]. To continue the way you are going would leave me no alternative but to simply not renew your lease there in 4 years—which would probably and unfortunately be a loss to both of us."

At this time, the owners of The Store, Ltd., also contacted several manufacturers and distributors, informing them that if they sold merchandise to Baycraft, The Store, Ltd., would not purchase from them. Baycraft, meanwhile, complied with Wolf's request not to deal with certain manufacturers or sell certain goods. Sometime after 1975, however, Baycraft returned to the marketing policies which originally caused The Store, Ltd.'s complaints.

In early 1979, representatives of Rouse held a series of meetings with Baycraft's owners to negotiate a new lease for Baycraft. One of Baycraft's owners stated that, in January 1979 and in March 1979, a Rouse representative informed him that Rouse continued to receive complaints from The Store, Ltd., about Baycraft. The owner said that, also in March, he was told that he "would have to be monitored if they [Rouse] were to renew [his] lease."

In April 1979, the manager of The Village Square allegedly informed the Baycraft owners that, because of continued competition with The Store, Ltd., Baycraft was going to have difficulty renewing its lease. One of the plaintiffs reported that, in a meeting that month, Rouse's director of

merchandising told him "that they didn't need a store like that in Cross Keys, [and] that [Baycraft's] lease was not going to be renewed as far as he was concerned." The plaintiffs were informed in December 1979 of Rouse's final decision not to renew Baycraft's lease.

█ In light of the standards for reviewing a summary judgment motion, we believe that there was presented evidence which "tends to exclude the possibility" that Rouse and the other defendants were acting independently. Moreover, there was evidence suggesting that one object of the alleged combination was to restrain price competition. Enough was shown to defeat the defendants' motion for summary judgment on the restraint of trade count, especially in view of the Supreme Court's indication that summary proceedings should be used sparingly in antitrust litigation. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

## II. Monopolization

The plaintiffs maintain that The Village Square is a unique geographic market and that Rouse, as landlord, monopolizes this market. The plaintiffs contend that exclusion from the market of The Village Square prevents a business from competing effectively for the customers that market serves. They argue that Rouse, by refusing to renew the leases of Baycraft and Raintree at The Village Square, excluded the businesses from this unique market and that these acts violated § 11–204(a)(2) of the Maryland Antitrust Act. We find no merit in the plaintiffs' contentions.

Section 11–204(a)(2) is analogous to § 2 of the Sherman Act, *supra,* which states that "[e]very person who shall monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States ... shall be deemed guilty of a felony ...." As with the restraint of trade issue, we are guided in our analysis of the monopoli-

zation contention by decisions of the federal courts interpreting § 2 of the Sherman Act.

■ The plaintiffs' argument appears to be an invocation of the essential facilities doctrine of antitrust analysis. Under this doctrine, a monopolist may in some circumstances be held liable for depriving competitors of access to a facility which is essential to compete in a given market. In *United States v. Terminal Railroad Association,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), for example, the Supreme Court ordered, *inter alia,* that a company composed of fourteen railroads which controlled all of the terminal facilities in St. Louis grant access to those facilities to other railroads. *See generally, Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Note, Refusals to Deal By Vertically Integrated Monopolists,* 87 Harv.L.Rev. 1720 (1974). *See also Gamco, Inc. v. Providence Fruit & Produce Building, Inc.,* 194 F.2d 484 (1st Cir.), *cert. denied* 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952).

The court in *MCI Communications v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1132 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983), explained the reasons for imposing liability in such cases as follows:

"Such a refusal may be unlawful because a monopolist's control of an essential facility (sometimes called a 'bottleneck') can extend monopoly power from one stage of production to another, and from one market into another. Thus, the antitrust laws have imposed on firms controlling an essential facility the obligation to make the facility available on non-discriminatory terms. *United States v. Terminal Railroad Association,* 224 U.S. 383, 410–411, 32 S.Ct. 507, 515–516, 56 L.Ed. 810 (1912); *Byars v. Bluff City News Co.,* 609 F.2d 843, 856 (6th Cir.1979)."

The court proceeded to list the elements necessary to establish liability under this doctrine: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practi-

cally or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Id.* at 1132–1133.

The doctrine is inapplicable here because Rouse and the plaintiffs are not competitors and because The Village Square is not a facility that is impractical or unreasonable to duplicate. Rouse rents retail space at The Village Square; it does not compete in household goods, which are the products sold by Raintree and Baycraft. Further, the plaintiffs acknowledge that exclusion from The Village Square did not prevent them from competing for *some* of the customers they formerly had there. Logically, if The Village Square were an essential facility, exclusion from which prevented a business from competing for that market's customers, the plaintiffs would not have retained the customers they did when they opened at a new location. The defendants' motions for summary judgment on the monopolization counts were properly granted.

### III. Malicious Interference With Business.

In the final count of the complaint, the plaintiffs maintain that some of the actions of The Store, Ltd., and its officers, which were allegedly taken to restrain trade at The Village Square in violation of the Maryland Antitrust Act, also constituted a tort, "malicious interference with the business and contractual rights" of Baycraft. The plaintiffs base the tort count on two allegations: (1) The Store, Ltd., and its owners induced Rouse to not renew Baycraft's lease; and (2) by threatening not to deal with two manufacturers who had also dealt with Baycraft, The Store, Ltd., and its owners coerced the manufacturers into not doing business with Baycraft.

This Court first held that there was a cause of action for maliciously interfering with another's right to pursue his business or occupation in *Lucke v. Clothing Cutters Assembly,* 77 Md. 396, 26 A. 505 (1893). In that case, the Court determined that a union's "wrongfully" causing an

employer to discharge a non-union employee was actionable, even though the discharge did not constitute a breach of an employment contract. Subsequently, the Court recognized in *Gore v. Condon*, 87 Md. 368, 39 A. 1042 (1898), that a cause of action existed in the narrower context in which a third party damaged another economically by causing someone to breach an existing contract. In that case, the Court stated as follows (87 Md. at 376, 39 A. 1042):

> "The right to maintain the action can also be sustained, upon the doctrine that a man who induces one of two parties to a contract to break it, intending thereby to injure the other or to obtain a benefit for himself, does the other an actionable wrong. *Lucke v. Clothing Cutters*, 77 Md. [396] 398 [26 A. 505]; *Angle v. Chicago, St. Paul, &c., Railway*, 151 U.S. [1] 14 [14 S.Ct. 240, 38 L.Ed. 55]; *Lumley v. Gye*, 2 El. & Bl. 216; *Bowen v. Hall*, 6 Q.B.D. 333; *Walker v. Cronin*, 107 Mass. 555."

As the *Lucke* and *Gore* cases illustrate, the two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract. The principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation.[10] The two types of actions differ in the limits on the right to interfere which will be recognized in either case. Thus, where a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted. A broader right to interfere with economic relations exists where no contract or a contract

---

**10.** For a discussion of the difference between the two types of the actions, *see Cumberland Glass Mnf'g Co. v. DeWitt*, 120 Md. 381, 394–395, 87 A. 927 (1913), *aff'd*, 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042 (1915).

terminable at will is involved. *See generally Goldman v. Building Assn.*, 150 Md. 677, 682, 133 A. 843 (1926); *Sumwalt Co. v. Knickerbocker*, 114 Md. 403, 414–415, 80 A. 48 (1911).[11]

The plaintiffs in this Court do not appear to argue that The Store, Ltd., and its officers caused third parties to breach any existing contracts. Rather, they seem to contend that these defendants maliciously caused Rouse and certain suppliers to discontinue business relationships with them. This Court listed the elements of this form of the tort in *Willner v. Silverman*. 109 Md. 341, 355, 71 A. 962 (1909) (quoting from *Walker v. Cronin*, 107 Mass. 562 (1881)):

---

**11.** Prosser traces the common law roots of the tort actions for interference with economic relations to the thirteenth century, by which time it was recognized that a master could bring an action for the damages sustained by the loss of the services of a servant because of violence inflicted upon him. In 1349, the Statute of Labourers, 23 Edw. III, st. 1, administered under the Statute of Labourers, 25 Edw. III, 1350, st. 1, provided a remedy to an employer against anyone enticing away or harboring a servant. As early as the fifteenth century, cases recognizing interference with relations other than master and servant appeared. In the nineteenth century, in the case of *Lumley v. Gye*, 2 El. & Bl. 216, 118 Eng.Rep. 749 (1853), the principle embodied in the protection afforded the master-servant relationship was extended to cover an action against a third party for inducing a breach of an employment contract. The principle was further extended to cover interference with advantageous economic relations even in·the absence of a contract. Prosser, *Torts*, § 129, pp. 929–930 (4th ed. 1971). *See also* Restatement (Second) of Torts § 766 comment c (1977).

*Lumley v. Gye* was first discussed in a Maryland case in *Ensor v. Bolgiano*, 67 Md. 190, 9 A. 529 (1887). The case involved allegations that a third party induced a breach of a contingent fee agreement between an attorney and his client. Judges Yellott and Bryan in dissenting opinions urged the application of *Lumley v. Gye* to the facts of that case, 67 Md. at 203, 204, 209–210, 9 A. 529; but the majority decided the case on other grounds, determining that it was unnecessary to reach the question of the applicability of the English decision to the relation of attorney and client. *Id.* at 201, 9 A. 529. *Lumley v. Gye* was also cited in *Lucke v. Clothing Cutters Assembly*, 77 Md. 396, 409, 26 A. 505 (1893), although it was distinguished on its facts. Finally, in *Gore v. Condon*, 87 Md. 368, 376, 39 A. 1042 (1898), the *Lumley* case was cited with approval.

" '(1) intentional and wilful acts;  (2) calculated to cause damage to the plaintiffs in their lawful business;  (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice);  and (4) actual damage and loss resulting.' "

A listing of the elements, however, provides little guidance in determining whether certain acts of interference constitute the tort.  For example, in some contexts the element of "malice" appears to have its traditional meaning of ill will or spite, *Willner v. Silverman, supra,* 109 Md. at 354, 357, 71 A. 962.  In other contexts, the Court has stated that "malice" means legal malice, and not ill will or spite, and that legal malice means "a wrongful act done intentionally without just cause or excuse," *McCarter v. Chamber of Commerce,* 126 Md. 131, 136, 94 A. 541 (1915).  Also, an act has been deemed malicious if it is unlawful, *Goldman v. Building Assn., supra,* 150 Md. at 682, 133 A. 843; *Klingel's Pharmacy v. Sharp & Dohme,* 104 Md. 218, 64 A. 1029 (1906).  The absence of just cause or excuse, or the element of malice, has actually been determined on a case by case basis.  For example, while there is no right to cause economic damage to another through the use of "force, violence, threats of force or threats of violence, intimidation or coercion," *My Maryland Lodge v. Adt,* 100 Md. 238, 250, 59 A. 721 (1905), whether specific acts are deemed coercive depends on the circumstances.  *Compare, e.g.,* what was considered to be the absence of coercion in *McCarter v. Chamber of Commerce, supra,* 126 Md. 131, 94 A. 541, with what was deemed coercive in *Lucke v. Clothing Cutters, supra,* 77 Md. 396, 26 A. 505.  *Compare also* the acts held unlawful in *Green v. Samuelson,* 168 Md. 421, 178 A. 109 (1935), with those deemed lawful in *Pocketbook Workers v. Orlove,* 158 Md. 496, 148 A. 826 (1930).  In addition, *compare* the discussion of conspiracy and motive in *Miller*

*v. Preston*, 174 Md. 302, 199 A. 471 (1938), with *Klingel's Pharmacy v. Sharp & Dohme, supra.*[12]

One recognized ground of "just cause" for damaging another in his business is competition. As this Court noted in *Goldman v. Building Assn., supra*, 150 Md. at 684, 133 A. 843:

> " 'Iron sharpeneth iron' is ancient wisdom, and the law is in accord in favoring free competition, since ordinarily it is essential to the general welfare of society, notwith-

12. Examination of the cases in this area discloses that the following comments by Professor Prosser are most apt (Prosser, *Torts, supra,* pp. 927–928):

> "[M]any courts have tended in the past to avoid any complete analysis of the problems, and to take refuge wherever possible in a formula. The law of business competition and labor disputes sometimes has been 'shrouded in a fog of catchwords and rubberstamp phrases,' through which it has been difficult to perceive the real basis of the decisions. It frequently has been necessary to look through the language of the court and rationalize the opinion in order to discover what it means....
>
> "In actions for interference with economic relations, the defendant's motive or purpose frequently is the determining factor as to liability, and sometimes it is said that bad motive is the gist of the action. Here, as so often elsewhere in the law of torts, the law has been vexed with the unhappy word 'malice.' Originally, when it was said in this type of action that the defendant's conduct was 'malicious,' it appears to have been meant in the sense of a desire to injure and do harm for its own sake; but the word has undergone a gradual process of vitiation, until it now has all shades of meaning from active malevolence, through an intent to profit at the expense of the plaintiff, to a mere intent, with knowledge of his interests, to do an act which will have the effect of interfering with them. Obviously such a term is to be avoided for the sake of clarity.
>
> "In recent years, however, the real problem underlying the question of motive has emerged as one of balancing the conflicting interests of the parties, and determining whether the defendant's objective shall prevail at the expense of economic harm to the plaintiff. 'The ground of the decision really comes down to a proposition of policy of rather a delicate nature concerning the merits of the particular benefit to themselves intended by the defendants, and suggests a doubt whether judges with different economic sympathies might not decide a case differently when brought face to face with the issue.' [quoting Holmes, *Privilege, Malice and Intent*, 8 Harv.L.Rev. 1 (1894)]. Although in the past few courts were inclined to do more than resort to catchwords, rules of thumb, or undefined terms such as 'malice,' there is now a very clear tendency to analyze the interests involved, and make a deliberate decision as to which shall prevail."

standing competition is not altruistic but is fundamentally the play of interest against interest, and so involves the interference of the successful competitor with the interest of his unsuccessful competitor in the matter of their common rivalry. Competition is the state in which men live and is not a tort, unless the nature of the method employed is not justified by public policy, and so supplies the condition to constitute a legal wrong.' "

As noted in *Goldman,* the right to compete has its limits. The Restatement (Second) of Torts, § 768 (1977), points this out as follows (emphasis supplied):

"§ 768. Competition as Proper or Improper Interference

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) *his action does not create or continue an unlawful restraint of trade* and

(d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will." [13]

The plaintiffs rely on this section of the Restatement, arguing that the defendants' conduct was improper and malicious because their actions were taken in furtherance of an illegal combination to restrain trade. *See Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 170–171 (3d Cir.

---

[13] This Court held in *Cumberland Glass Mnf'g Co. v. DeWitt, supra,* 120 Md. 381, 87 A. 927, that competition did not justify causing another to breach an *existing* contract with a competitor.

1979) (finding of a price-fixing combination in violation of § 1 of the Sherman Act would destroy privilege to interfere with business and would constitute a common law tort under Pennsylvania law).

We agree that the defendants' acts, if proven to be part of a price-fixing combination in violation of the Maryland Antitrust Act, would also constitute the Maryland common law tort of malicious interference with the plaintiffs' business. Under these circumstances, the acts would be unlawful and thus improper. *Goldman v. Building Assn., supra,* 150 Md. at 682, 133 A. 843. Moreover, even before the enactment of the state antitrust statute, this Court took the position that acts in furtherance of a price-fixing conspiracy or combination were unlawful and that, if damage resulted from such acts, those injured had a cause of action for interference with their business. *Klingel's Pharmacy v. Sharp & Dohme, supra,* 104 Md. 218, 64 A. 1029.[14]

In *Klingel's Pharmacy,* the trial court had sustained the defendants' demurrer to a declaration alleging, *inter alia* (104 Md. at 227, 64 A. 1029):

"That the defendants, the Calvert Drug Company, and Sharp & Dohme are corporations which have been for some time and still are engaged in the business of selling drugs and druggist's supplies. That the other defendant, the Baltimore Retail Drug Association, is a corporation formed and organized for the purpose, amongst other things, of unlawfully maintaining amongst dealers in drugs and druggists' supplies, the maximum rate schedule of prices and of preventing, *in restraint of trade,* all vendors of drugs and druggists' supplies, who are unwilling to acquiesce in and submit to the prices so fixed by it, from buying at any price the drugs and druggists' sup-

---

**14.** We note that although antitrust statutes trace their origins to common law restrictions upon restraints of trade, not every restraint of trade found unreasonable under the Sherman Act and similar statutes would necessarily have been an illegal restraint of trade at common law. *See Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

plies needed and desired by them in their business, by the *unlawful coercion of threats* that any and all vendors of drugs and druggists' supplies who shall sell for less than the schedule prices shall be themselves *blacklisted* and all sales of drugs and druggists' supplies be refused them; and that all the members of said Retail Drug Association are bound by an agreement not to sell such supplies to any person or corporation who will not agree to maintain its maximum schedule of prices."

The Court stated that this alleged combination,

"if it does exist, and we are bound to assume that it does when dealing with the issue raised by the demurrer, is a criminal conspiracy at the common law and is punishable by fine and imprisonment after indictment and conviction." *Id.* at 230, 64 A. 1029.

The Court also held that a cause of action in tort had been set forth, in light of the allegations that the plaintiff had suffered damages because of acts in furtherance of the price-fixing combination, including the refusal by the defendants to deal with the plaintiff and the defendants' actions in causing others not to deal with the plaintiff. *Id.* at 237, 64 A. 1029.

We are presented in this case with similar allegations, supported by sufficient evidence to defeat summary judgment. The plaintiffs have produced some evidence indicating the following: (1) a combination or conspiracy to fix prices existed; (2) some of the defendants, The Store, Ltd., and its officers, induced another defendant, Rouse, not to renew Baycraft's lease; (3) The Store, Ltd., and its officers, to further the combination or conspiracy, caused third parties not to deal with the plaintiffs; and (4) the acts of the defendants damaged the plaintiffs. The defendants' actions, as characterized by the plaintiffs and some of their evidence, are actionable at common law under the *Klingel* holding. Furthermore, the conspiracy or combination, as indicated by the plaintiffs' evidence, would violate the Maryland Antitrust Act and is thus illegal. If the plaintiffs can convince a jury with the evidence they produce at trial, they

will be entitled to recover damages for malicious interference with their business.[15] Therefore, the trial judge erred in granting the defendants' motion for summary judgment on the count asserting interference with business relations.

Turning to the matter of damages, the plaintiffs seek treble damages under the antitrust restraint of trade count and compensatory and punitive damages under the common law tort count.[16] The tort count is based on alleged acts which are identical to some of the acts set forth in the statutory restraint of trade count. If the plaintiffs succeed in convincing the jury of the defendants' liability under these counts, an award of both treble damages and punitive damages would clearly be duplicative. An award of treble damages for antitrust violations embodies both punitive and compensatory damages. *See Superturf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1283 (8th Cir.1981); *Clark Oil Co. v. Phillips Petroleum Co.,* 148 F.2d 580, 582 (8th Cir.), *cert. denied,* 326 U.S. 734, 66 S.Ct. 42, 90 L.Ed. 437 (1945). This Court has previously held that three separate awards for punitive damages based on the same conduct were inappropriate. *Montgomery Ward & Co. v. Cliser,* 267 Md. 406, 424–425, 298 A.2d 16 (1972). Thus, the plaintiffs, if they succeed in proving their case against The Store, Ltd., and its officers, will have to choose between receiving treble damages for the antitrust violation or compensatory and punitive damages for the tort arising from some of the same acts. *See Superturf, Inc. v. Monsanto Co., supra,* 660 F.2d at 1283–1284 (recognizing that an award of treble damages for an antitrust violation and

---

**15.** The plaintiffs, of course, will not be limited at trial to proving the elements of the malicious interference tort solely by evidence of price-fixing. We deal here only with what the plaintiffs have produced in order to defeat the motion for summary judgment. *See* notes 6, 7 and 8, *supra.*

**16.** With regard to the type of showing necessary to recover punitive damages for interference with business relations, *see Rite Aid Corp. v. Lake Shore Inv.,* 298 Md. 611, 627, 471 A.2d 735 (1984), and cases there cited.

punitive damages for common law tortious interference with business relations, based on same conduct, would be duplicative, holding that punitive and treble damages cannot both be awarded, and indicating that a special jury verdict in this situation would be appropriate).[17]

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE DEFENDANT–APPELLEES.

---

**17.** *See* Maryland Rule 2–522(c) regarding special verdicts. With respect to alternate causes of action based upon the same facts, resulting in possible different measures of damages, and the time for election, *see Widgeon v. Eastern Shore Hosp. Center,* 300 Md. 520, 535, 479 A.2d 921 (1984), and cases there cited.